[No. S024116. May 30, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL COREY SLAUGHTER, Defendant and Appellant.

1190

COUNSEL

John F. Schuck, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Wanda Hill Rouzan and Harry Joseph Colombo, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**GEORGE, C. J.**—Defendant Michael Corey Slaughter was convicted, following a jury trial, of two counts of murder (Pen. Code, § 187, subd. (a)),[1] one count of attempted murder (§§ 664, 187), and one count of robbery (§ 211). With regard to the murders, the jury found true the special circumstance allegations of multiple murder and murder in the commission of a robbery. (§ 190.2, subd. (a)(3), (17).) The jury further found true the allegations that defendant personally used a firearm in the commission of the charged offenses (§ 12022.5, subd. (a)) and inflicted great bodily injury on the victim of the attempted murder (§ 12022.7, subd. (a)). The initial jury was unable to reach a verdict at the penalty phase trial, and a mistrial was declared. A second jury was selected and, following a second penalty phase trial, that jury returned a verdict of death. This appeal from the resulting judgment is automatic. (§ 1239, subd. (b).) For the reasons that follow, we affirm the judgment.

## FACTS

On January 24, 1990, Jeff DeRouen, Eddie Keith, and Djamal Littleton drove from Pittsburg, California, to Modesto in Keith's Mustang automobile to purchase two kilos of cocaine from defendant for $30,000. The deal had been arranged by Roland Mourning, a mutual friend of DeRouen's and defendant's, while Mourning was incarcerated in the Stanislaus County Jail. DeRouen, Keith, and Littleton had $45,000 they had obtained from a drug dealer known to them as "Jeest." They carried $30,000 in a small, gray Nike backpack or bag and placed the remaining $15,000 in a plastic bag under the rear seat of the vehicle.

At approximately 6:30 p.m., the three men picked up defendant in Modesto. Defendant was wearing a red ski jacket and black gloves. He got

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

into the backseat with Littleton. At defendant's direction, Keith drove the Mustang onto the freeway and entered the left lane, traveling approximately 60 miles per hour. Littleton was looking out the window when he heard a loud bang and felt his body go numb. He then saw two flashes at the back of DeRouen's head.

Helio Silveira was on the same freeway, driving home from work, when he saw a light flash inside the Mustang and a window burst on the driver's side of the vehicle. The Mustang veered down an embankment, went through a chain link fence, and came to rest on some railroad tracks, with the engine still running. Silveira stopped his vehicle and went to help. As he approached the Mustang, he saw a man wearing a red jacket leave the passenger side of the vehicle and run from the scene. A .45-caliber semiautomatic pistol was lying on the floor near the backseat of the vehicle. Subsequently, it was ascertained that there was a bullet in the chamber and the pistol was cocked and ready to fire. The pistol's magazine, which can hold seven bullets, was empty. There were six empty shell casings in the vehicle. A passerby found a bloody red jacket by the side of the road; defendant's girlfriend identified it as belonging to defendant. Law enforcement officers found in the vicinity a black glove and a red baseball cap that also belonged to defendant.

DeRouen had been shot twice in the head and was dead. Keith also was dead, having been shot in the head and shoulder. Littleton had been shot in the side and in the knee, but survived. Subsequent tests revealed that bullets recovered from the bodies of DeRouen and Littleton and from the Mustang had been fired from the .45-caliber semiautomatic handgun found in the vehicle.

Shortly after the shootings, Josh Brown was driving near Modesto Junior College when he saw defendant running from the direction of the freeway. Defendant yelled for Brown to stop and asked for a ride. Brown agreed. Defendant was carrying what appeared to be a backpack and was breathing heavily and perspiring. Defendant placed his backpack on the floor of Brown's vehicle, and "a couple rolls" of money spilled out. When Brown dropped him off, defendant offered Brown "a handful of money" for gas. Brown declined the offer.

About 9:00 that night, defendant went to a Mazda dealership in Modesto. Defendant had been there a few days earlier and told the salesman that he planned to pay cash for an automobile. Defendant test-drove a Mazda MX6 automobile and agreed to purchase it for $20,445. Defendant paid $17,000 in cash and promised to return the next day with the balance.

Defendant was arrested shortly after he returned home with his new automobile. He waived his right to remain silent and initially denied knowing the victims. After later being told that his clothing had been found at the scene of the crime, defendant admitted agreeing to sell cocaine to the victims and riding in the Mustang automobile. Defendant said that when Littleton pointed a gun at him, defendant shot Littleton with a gun that defendant found on the floor of the automobile. Defendant said that after he fired the first shot, the gun "just kept going," causing him accidentally to shoot the other victims.

At trial, defendant testified that while they were driving, Littleton pointed a gun at him and demanded that defendant give him the cocaine. Defendant complied and then picked up a firearm that he found on the floor of the automobile. Littleton and DeRouen struggled with defendant for control of the weapon and, during the struggle, defendant shot Littleton and DeRouen in self-defense and Keith by accident.

At the retrial of the penalty phase—held before a new jury after the first jury failed to agree on penalty—the prosecution introduced much of the same evidence that it had introduced during the guilt phase. Defendant offered the testimony of his high school vice-principal and a school counselor that defendant had been "well behaved" and was a good art student. Defendant's mother, father, brother, and aunt testified that defendant was a friendly and loving child with good manners and was an excellent artist. They stated they loved defendant and asked the jury to show him mercy. A friend from junior high school testified that defendant was friendly and had a good sense of humor.

DISCUSSION

*Guilt Phase Issues*

A. *Voir Dire*

██ Defendant contends that the trial court erred in failing to sequester and question individually the prospective jurors regarding their views on the death penalty, citing *Hovey v. Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301], in which this court declared, "pursuant to its supervisory authority over California criminal procedure, that in future capital cases that portion of the voir dire of each prospective juror which deals with issues which involve death-qualifying the jury should be done individually and in sequestration." (*Id.* at p. 80, fn. and italics omitted; see also *People v. Anderson* (1987) 43 Cal.3d 1104, 1135 [240 Cal.Rptr. 585,

742 P.2d 1306]; *People v. Cudjo* (1993) 6 Cal.4th 585, 628 [25 Cal.Rptr.2d 390, 863 P.2d 635].)

Nearly a decade later, on June 5, 1990, the voters adopted Proposition 115 which, among other things, added section 223 of the Code of Civil Procedure, containing the following provision: "Voir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death penalty cases." We have held that the enactment of Code of Civil Procedure section 223 abrogated the rule announced in *Hovey v. Superior Court, supra,* 28 Cal.3d 1. (*People v. Box* (2000) 23 Cal.4th 1153, 1180 [99 Cal.Rptr.2d 69, 5 P.3d 130]; *People v. Waidla* (2000) 22 Cal.4th 690, 713 [94 Cal.Rptr.2d 396, 996 P.2d 46]; *Covarrubias v. Superior Court* (1998) 60 Cal.App.4th 1168, 1171 [71 Cal.Rptr.2d 91].) Accordingly, the trial court properly did not sequester prospective jurors during voir dire.[2]

B. *Instruction to View Defendant's Extradjudicial Statement with Caution*

As noted above, defendant gave two statements to the police shortly after committing the offenses. In his second statement, he admitted shooting the victims but claimed that he shot Littleton after Littleton pointed a gun at him and that the gun "just kept going," causing defendant accidentally to shoot the other two victims. Defendant testified at trial that he shot Littleton and DeRouen in self-defense and shot Keith accidentally.

At the guilt phase and the second penalty phase, the trial court gave the jury an instruction (based upon CALJIC No. 2.71) that stated: "An admission is a statement made by a defendant other than at this trial which does not by itself acknowledge guilt of the crime for which the defendant is on trial, but which tends to prove guilt when considered with the rest of the evidence. . . . [¶] Evidence of an oral admission of a defendant should be viewed with caution." Although defendant did not object in the trial court to this instruction, the propriety of the instruction nonetheless is reviewable on appeal to the extent it affects his substantial rights. (§ 1259.)

Defendant contends the trial court erred in giving this instruction at the guilt phase and at the second penalty phase trial, because there is a

---

[2]With regard both to this claim and to every other claim raised in his brief, defendant asserts that each alleged error violates not only state law but multiple provisions of the federal and California Constitutions. In addressing each claim discussed in this opinion, we have considered defendant's contention that the alleged error violates the federal and California Constitutions, and our rejection of each claim of reversible error includes a determination that the alleged error does not warrant reversal under the state or federal Constitution.

reasonable likelihood that it caused the jury to view with suspicion the exculpatory portions of defendant's statements. Defendant asserts the instruction should not have been given at all, because defendant's statements were tape-recorded and the tape recording was played for the jury. Although defendant is correct that the trial court should not have so instructed the jury, for the reasons he gives, the error was harmless.

■ When evidence is admitted establishing that the defendant made oral admissions, the trial court ordinarily has a sua sponte duty to instruct the jury that such evidence must be viewed with caution. (*People v. Beagle* (1972) 6 Cal.3d 441, 455 [99 Cal.Rptr. 313, 492 P.2d 1].) We have explained, however, that "the purpose of the cautionary instruction is to assist the jury in determining if the statement was in fact made. [Citation.]" (*Id.* at p. 456.) Accordingly, we also have held that this cautionary instruction should not be given if the oral admission was tape-recorded and the tape recording was played for the jury. (*People v. Mayfield* (1997) 14 Cal.4th 668, 776 [60 Cal.Rptr.2d 1, 928 P.2d 485].)

■ To the extent that defendant's admissions were inculpatory, it is clear that defendant could not have been prejudiced by the giving of an instruction that the jury should view this evidence with caution. Defendant contends, however, that he suffered prejudice because there is a reasonable likelihood that the instruction caused the jury to view with suspicion the exculpatory portions of defendant's statements. The instruction, however, defined an admission as an out-of-court statement by defendant "which tends to prove guilt." "In light of the definition of 'admission,' if the jury determines a statement does not tend to prove guilt when considered with the other evidence, it is not an admission. The cautionary language instructs the jury to view evidence of an *admission* with caution. By its terms, the language applies only to statements which tend to prove guilt and not to statements which do not." (*People v. Vega* (1990) 220 Cal.App.3d 310, 317 [269 Cal.Rptr. 413].) "Juries understand that this instruction by its terms applies only to statements tending to prove guilt, not to exculpatory ones. To the extent a statement is exculpatory it is not an admission to be viewed with caution. [Citation.]" (*People v. Senior* (1992) 3 Cal.App.4th 765, 777 [5 Cal.Rptr.2d 14].)

Defendant could not have been prejudiced, therefore, by the erroneous giving of the instruction to view his admissions with caution.

Moreover, in addition to the introduction of his out-of-court statements, defendant's testimony offering his explanation for the shooting was received at the guilt phase of the trial. The jury was not instructed to view his

testimony with caution and yet demonstrated, by its verdict of guilty, that it disbelieved his testimony. It does not appear, therefore, that the giving of the instruction to view defendant's admissions with caution led the jury to disbelieve defendant's explanation for the shooting.

With reference to the giving of CALJIC No. 2.71 at the second penalty phase, defendant cites *People v. Livaditis* (1992) 2 Cal.4th 759, 782-784 [9 Cal.Rptr.2d 72, 831 P.2d 297], in which we held that a "court is required to give the cautionary instruction at the penalty phase only upon defense request." We observed that a defendant may not desire such an instruction at the penalty phase, because "[w]hether a particular statement is aggravating or mitigating is often open to interpretation." (*Id.* at p. 783.) We distinguished the holding in *People v. Vega, supra,* 220 Cal.App.3d 310, that the jury would understand to apply the instruction only to statements that were inculpatory, on the ground that "[a]t the penalty phase, the distinction between mitigation and aggravation is often more blurred than the distinction between a statement that incriminates and one that does not." (*People v. Livaditis, supra,* 2 Cal.4th at p. 784.) Offering as an example a statement in which a defendant states he is sorry he stabbed the victim, we noted that such a statement is aggravating, because it admits guilt, but also mitigating, because it expresses remorse.

Defendant's statements in the present case are distinguishable. Defendant did not admit guilt; he disclaimed all responsibility for the crimes, stating he acted in self-defense and accidentally. Unlike the example considered in *Livaditis,* the distinction between mitigation and aggravation was not blurred. Defendant admitted firing the gun, but he claimed he did so innocently. It is not reasonably probable that the jury would have applied the instruction (to view defendant's admissions with caution) to his statements that he acted in self-defense and accidentally.

Accordingly, we conclude that the trial court's error in instructing the jury to view with caution defendant's tape-recorded admissions was harmless. It is not reasonably probable the guilt phase jury would have reached a result more favorable to defendant had the instruction not been given (*People v. Carpenter* (1997) 15 Cal.4th 312, 393 [63 Cal.Rptr.2d 1, 935 P.2d 708]), and there is no reasonable possibility that the second penalty phase jury would have rendered a different verdict in the absence of the error (*People v. Cunningham* (2001) 25 Cal.4th 926, 1018-1019 [108 Cal.Rptr.2d 291, 25 P.3d 519]).

### C. *Failure to Give Accomplice Instruction Sua Sponte*

Defendant contends that because Littleton assertedly was an accomplice, the trial court erred in failing to instruct the jury, sua sponte, that it

should view Littleton's testimony with caution. (CALJIC No. 3.18.) The trial court instructed the jury that "[t]he testimony of an accomplice ought to be viewed with distrust" and that "[a]n accomplice is a person who was subject to prosecution for the identical offenses charged in Counts I, II, III and IV against the defendant on trial by reason of aiding and abetting or being a member of a criminal conspiracy." The trial court further instructed the jury that it "must determine whether the witness Roland Rocky Mourning was an accomplice," but the court did not instruct the jury that it also should determine whether Littleton was an accomplice. The trial court did not err.

■ "When an accomplice is called to testify on behalf of the prosecution, the court must instruct the jurors that accomplice testimony should be viewed with distrust." (*People v. Guiuan* (1998) 18 Cal.4th 558, 565 [76 Cal.Rptr.2d 239, 957 P.2d 928].)[3] Section 1111 defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

■ It is clear that Littleton was not an accomplice within the meaning of section 1111. Although he would have been an accomplice if defendant were being prosecuted for the planned cocaine transaction, he was not an accomplice in the present case, because he was not "liable to prosecution" for the offenses charged—namely, his own attempted murder, the robbery of himself and his companions, and the murder of his companions. (§ 1111.)

Defendant argues that Littleton was liable to prosecution for the murder of his companions under the provocative act theory. (*People v. Cervantes* (2001) 26 Cal.4th 860, 867-872 [111 Cal.Rptr.2d 148, 29 P.3d 225]; *People v. Mai* (1994) 22 Cal.App.4th 117 [27 Cal.Rptr.2d 141].) We disagree.

"The provocative act murder doctrine has traditionally been invoked in cases in which the perpetrator of the underlying crime instigates a gun battle, either by firing first or by otherwise engaging in severe, life-threatening, and usually gun-wielding conduct, and the police, or a victim of the underlying crime, responds with privileged lethal force by shooting back and killing the perpetrator's accomplice or an innocent bystander. [Citations.]" (*People v. Cervantes, supra,* 26 Cal.4th 860, 867; *People v. Gilbert* (1965) 63 Cal.2d 690, 704 [47 Cal.Rptr. 909, 408 P.2d 365], revd. on other grounds in *Gilbert*

---

[3]Subsequent to the trial in the present case, we held in *People v. Guiuan, supra,* 18 Cal.4th 558, 569, that the following instruction should be given when an accomplice testifies: " 'To the extent an accomplice gives testimony that tends to incriminate the defendant, it should be viewed with caution. This does not mean, however, that you may arbitrarily disregard that testimony. You should give that testimony the weight you think it deserves after examining it with care and caution and in the light of all the evidence in the case.' "

*v. California* (1967) 388 U.S. 263 [87 S.Ct. 1951, 18 L.Ed.2d 1178].) In the present case, defendant's testimony that Littleton pointed a gun at him and demanded the cocaine is not sufficient to establish that Littleton instigated a gun battle within the meaning of the provocative act murder doctrine. "[M]ere participation in an armed robbery is not sufficient to invoke murder liability, direct or vicarious, when the victim resists and kills." (*In re Joe R.* (1980) 27 Cal.3d 496, 504 [165 Cal.Rptr. 837, 612 P.2d 927], fn. omitted; *People v. Washington* (1965) 62 Cal.2d 777 [44 Cal.Rptr. 442, 402 P.2d 130].)

Because the evidence in this case is insufficient to support a murder charge against Littleton on a provocative act theory, we have no occasion to determine whether a trial court would have a sua sponte obligation to instruct the jury on this theory in the absence of a claim by the defendant at trial that a witness who ostensibly was a victim of defendant's criminal conduct actually was "liable to prosecution" for murder on a provocative act theory and should be considered an "accomplice" for purposes of section 1111.

### D. *Corroboration of Accomplice Testimony*

 Defendant contends there is insufficient evidence to support his convictions, because Littleton's testimony was not corroborated.

 "It is the prosecution's burden in a criminal case to prove every element of a crime beyond a reasonable doubt. [Citation.] To determine whether the prosecution has introduced sufficient evidence to meet this burden, courts apply the 'substantial evidence' test. Under this standard, the court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence —that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] The focus of the substantial evidence test is on the whole record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence." ' [Citation.] . . . [¶] There are exceptions, however, to the substantial evidence test. The Legislature has determined that because of the reliability questions posed by certain categories of evidence, evidence in those categories by itself is insufficient as a matter of law to support a conviction. For example, the Legislature has required that the testimony of an accomplice (Pen. Code, § 1111) . . . must be corroborated before a conviction can be based on [it]." (*People v. Cuevas* (1995) 12 Cal.4th 252, 260-261 [48 Cal.Rptr.2d 135, 906 P.2d 1290], italics omitted.)

 For the reasons stated above, Littleton was not an accomplice within the meaning of section 1111. Corroboration of his testimony thus was

not required. But even if it were, the record discloses ample corroboration of Littleton's testimony.

The requisite corroboration of the testimony of an accomplice " 'may be established entirely by circumstantial evidence. [Citations.] Such evidence "may be slight and entitled to little consideration when standing alone. [Citations.]" ' [Citation.] 'Corroborating evidence "must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged." [Citation.]' " (*People v. Zapien* (1993) 4 Cal.4th 929, 982 [17 Cal.Rptr.2d 122, 846 P.2d 704].) Littleton's testimony that defendant shot him and shot and killed his companions was sufficiently corroborated by defendant's own out-of-court admissions and testimony at trial in which defendant admitted shooting and killing the victims. Defendant's admissions and testimony certainly tended to implicate defendant and related to an element of the crime. It was not required that the corroborative evidence establish every element of the crime.

### E. *CALJIC No. 2.90*

The trial court instructed the jury on reasonable doubt, pursuant to former CALJIC No. 2.90, as follows: "Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs and depending on moral evidence is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charges." Defendant contends this instruction was erroneous, because it uses the terms "moral evidence" and "to a moral certainty" to define reasonable doubt. " 'We have repeatedly upheld the efficacy of this instruction, and defendant cites no persuasive reason to revisit this conclusion.' [Citations.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 330 [75 Cal.Rptr.2d 412, 956 P.2d 374].)

### F. *Circumstantial Evidence Instruction*

Defendant contends that three jury instructions concerning circumstantial evidence were erroneous because they told the jury that if one interpretation of the evidence "appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable." According to defendant, these instructions were contrary to the requirement of proof beyond a reasonable doubt, because they required the jury to accept an interpretation of the evidence that appears

reasonable, which is a lesser standard than proof beyond a reasonable doubt. We have rejected this contention. (*People v. Mendoza* (2000) 24 Cal.4th 130, 181 [99 Cal.Rptr.2d 485, 6 P.3d 150].)

### Penalty Phase Issues

A. *First Penalty Phase Jury's Request to Address Defendant*

On the third day of deliberations at the first penalty phase of the proceedings, the jury sent the court a note stating: "Are we permitted to address the defendant to let him know our <u>feelings</u>—regardless of our decision? Such as: the majority feels he should die for his crimes, however, we are capable of showing <u>him</u> mercy by finding for life." (Underscoring in original.) After discussing the matter with counsel, the court sent back a note asking, "Do you have a verdict?" to which the jury replied, "pending the answer to your [*sic*] our question."

Outside the presence of the jury, the court stated it was not inclined to grant the jury's request to address defendant: "I am very reluctant to have the jury say anything, other than reach a verdict, if they can. I think the jury expresses their feelings in the matter by way of a verdict. I don't think they should be given the green light to lecture somebody or to say anything other than their verdict." Defense counsel disagreed: "I believe the jury has clearly indicated that they are prepared to exercise their authority by voting for life without possibility of parole only provided that they can tell the defendant personally how they are disgusted, if that's an appropriate term, with his actions. And that to prohibit them from doing what they are legally permitted to do by the law I believe would be coercive of a death penalty and would be overturned."

The court summoned the jury and instructed it "that you are not permitted to address anyone except the Court *prior to having reached a verdict.*" (Italics added.) The jury foreperson responded: "Your Honor, I really don't think we're going to be able to come to a decision. We're at a stalemate right now." The court asked whether there was anything the court could do to assist the jury, such as giving further instructions. The foreperson responded: "No, not after just the last statement you just gave us. That was basically our last hope right there. And that was—that was thrown out, so, no, we're at a stalemate right now."

The jury resumed deliberations but, a short time later, announced it could not reach a decision. In response to the court's inquiry, the foreperson indicated that the final ballot taken during deliberations was "nine, one and

and [*sic*] two undecided." The court declared a mistrial. A new jury was selected, a second penalty phase was conducted, and the jury returned a verdict of death.

■ Defendant contends: "If the jury, as the conscience of the community, expresses its intention to impose an LWOP [life without possibility of parole] verdict if it could just address or make a statement to the defendant, it must be allowed to do so." Defendant cites no authority to support this contention, but argues that "[t]he jury must be permitted to express its conscience as long as such expression does not run afoul of any specific, express preclusion." Defendant claims he was prejudiced, "because the jury unequivocally indicated that if it were allowed to address Defendant, it could render an LWOP verdict . . . ." Defendant asks that this court reverse the judgment of death and impose a sentence of life imprisonment without possibility of parole.

The question whether a trial court may, should, or must permit a jury in a capital case to accompany its verdict with a statement to the defendant is an issue of first impression. Neither party has cited, and our research has not revealed, a case based upon closely similar circumstances. Nonetheless, we need not resolve this issue in the present case because, as we shall explain, given the record in this case defendant is not entitled to the relief that he seeks—namely, an order of this court modifying the sentence of death to a sentence of life imprisonment without possibility of parole.[4]

To begin with, we disagree with defendant's assertion that the record demonstrates that the jury unequivocally indicated it would return a verdict imposing the lesser punishment in the event it were to be permitted to address defendant. It is clear that the jury was having great difficulty in reaching a verdict and, apparently, considered the possibility that it might be able to achieve a compromise were it to be permitted to address defendant. But the foreperson indicated that its final ballot was "nine, one and and [*sic*] two undecided." This statement certainly reflects the circumstance that the jury was seriously divided. Although it is possible that the jury would have returned a verdict of life in prison without the possibility of parole had it been permitted to address defendant, the jury did not state "unequivocally" that this was its intention. We would have to engage in speculation to conclude that the jury would have returned a certain verdict or, indeed, any

---

[4]Although, as explained above, we need not decide whether the trial court erred in denying the jury's request, we observe that, in general, it would be hazardous to permit a jury to address the defendant until all verdicts have been returned and recorded. We express no opinion concerning whether the same would be true if a court permitted the jury to address the defendant *after* the verdicts had been returned and recorded. (§ 1164.)

verdict at all, had the jury been granted permission to address defendant. We do not know, for example, whether the jury as a whole indicated that it would return a verdict of life without possibility of parole if it could address defendant, or whether some (but not all) jurors might have been willing to vote for such a verdict if the jury could address defendant. The jury's request may have been its last hope, but we do not know whether that hope would have been realized had the court granted the request.

Because we cannot determine from the record what the first jury would have done had the trial court acceded to that jury's request to address defendant, defendant cannot demonstrate that the trial court's action deprived him of a sentence of life imprisonment without the possibility of parole. Had the first jury returned a verdict of death following the court's denial of its request, and were we to find that the court erred in denying the jury's request, a reversal of such a judgment might well be warranted, given the applicable standard of a reasonable possibility that defendant would have obtained a more favorable result in the absence of the error. (*People v. Brown* (1988) 46 Cal.3d 432, 447-448 [250 Cal.Rptr. 604, 758 P.2d 1135].) But in this case the first jury did not reach a verdict, a mistrial was declared, and a new jury was impaneled. The second jury returned a verdict that was unaffected by the alleged error upon which defendant now relies. Because we do not know what the first jury would have done had the trial court granted its request, the only appropriate remedy that could be granted —even if we were to find that the trial court erred in denying the jury's request—would be to afford defendant a new penalty phase trial free from such purported error. Defendant already has been afforded a new penalty phase trial free from such error, and at that trial the second jury imposed the sentence of death that now is before us. Accordingly, even if we were to conclude that the trial court erred in denying the first jury's request to address defendant, reversal of the judgment would not be warranted.

Defendant contends that he was placed twice in jeopardy, arguing there was no legal necessity for a mistrial because the first jury's impasse was the direct result of judicial error. Again, however, whether error or misconduct in the course of a trial caused a jury's failure to reach a verdict is necessarily speculative. And regardless of the cause of the difficulty, where " 'it satisfactorily appears to the court that there is no reasonable probability that the jury can resolve its differences and render a verdict' " (*People v. Wash* (1993) 6 Cal.4th 215, 247-248 [24 Cal.Rptr.2d 421, 861 P.2d 1107]), the court has no legal alternative but to discharge the deadlocked jury and declare a mistrial. Accordingly, defendant's double jeopardy claim lacks merit.

### B. *Prosecutorial Misconduct—Biblical References*

In his argument to the second penalty phase jury, the prosecutor explained the factors the jury could consider in deciding whether to impose the death penalty. The prosecutor told the jury that the final factor, set forth in section 190.3 as factor (k), was "a catchall provision" that permitted the jury to "take into consideration sympathy for the defendant [and] give him all the mercy that you want." The prosecutor attempted to persuade the jury, however, that the death penalty was the appropriate penalty in light of the circumstances of the offense, that there was no reason to have sympathy for defendant, and that defendant was "entitled to the same mercy that he showed the victims in this case." He then described the circumstances of the offense in some detail. Near the end of his argument, the prosecutor made the following statements that defendant contends constituted prosecutorial misconduct.

"I want to briefly discuss a subject that I want to make very clear to you is not aggravating. It's not aggravating at all, and the only reason I bring it up is because in the event any of you have any reservations or any, I don't know if the right word would be hang-ups or not, but any problems in the area, the role that religion plays in a case like this, and again, it's not aggravating.

"The opponents of the death penalty cite passages from the Bible, as do the proponents, and you may have seen some TV programs where they have both sides and they go back and forth. The opponents say, 'Thou shalt not kill.' In fact, we had a witness who sat here and said that God's the only one who can make that decision. And they say that we as a state or the government, we're doing the same thing that these people did. We're killing people. We can't do that. You shouldn't do that. Its not right. And they cite a passage in Romans in the Bible that says, 'Vengeance is mine, saith the Lord. I will repay.'

"But if you go to the very next chapter, Paul goes on and says, 'The ruler bears not the sword in vain for he is the minister of God, a revenger to execute wrath upon him that doeth evil.' He's talking about the government.

"You go back to the Old Testament, the first five books, I believe the Old Testament is the Jewish Torah. In any event, the Judeo-Christian ethic comes from the Old Testament, and in Genesis, the very first book of the Bible, the scripture says, 'Adam, human being, whoever sheds the blood of man by man shall his blood be shed, for in his image did God make man.'

"There are two important concepts there. Capital punishment for murder is necessary in order to preserve the sanctity of human life and only the severest penalty of death can underscore the severity of taking life.

"There are several other passages in the Bible that talk about the death penalty or death, not referred to in the Bible as the death penalty, but the one that I find quite interesting is Exodus, chapter 21 verses 12 through 14. It says, 'Whoever strikes another man and kills him shall be put to death. But if he did not act with intent, but they met by act of God, the slayer may flee to a place which I will appoint for you.'

"This is the Lord speaking, and he's saying, if you believe in that particular religion, he's saying, 'If you didn't do this intentionally, there's a sanctuary for you where nobody can harm you.' I suppose its something like life without possibility of parole.

"But it goes on to say, 'If a man has the presumption to kill another by treachery, you shall take him even from my altar, to be put to death.' In other words, there's no sanctuary for somebody that kills by treachery, an intentional, cold-blooded killer. You can take him from the altar and he shall be put to death.

"Now, again, I don't give that to you in aggravation because it's not. Just if you have any religious considerations at all that are bothering you or concerning you, that's just for your use."

The prosecutor had made similar biblical references during his argument to the first penalty phase jury. Defendant did not object to any portion of the prosecutor's arguments at either penalty phase trial.

■ Defendant contends the prosecutor's biblical references during his argument at the second penalty phase trial constituted prosecutorial misconduct and requires reversal of the judgment of death. The People concede that the prosecutor's biblical references were improper, but assert defendant forfeited the issue by failing to object and that any such error was harmless.

We agree with the People that defendant forfeited this issue by failing to object at trial. (*People v. Wrest* (1992) 3 Cal.4th 1088, 1105 [13 Cal.Rptr.2d 511, 839 P.2d 1020].) Defendant had reason to anticipate that the prosecutor would refer to the Bible during his argument to the second penalty phase jury, because the prosecutor had made similar biblical references during his argument to the first penalty phase jury. And yet defendant did not seek to prevent the prosecutor from repeating these remarks at the second penalty phase (see *People v. Marshall* (1996) 13 Cal.4th 799, 854-855 [55 Cal.Rptr.2d 347, 919 P.2d 1280] ["the trial court retains discretion . . . to ensure that argument does not stray unduly from the mark"]), and did not object when the prosecutor again referred to the Bible during argument.

Defendant asserts that trial counsel was ineffective for failing to object. The record on appeal does not disclose defense counsel's reason for not objecting, and we are not convinced that there could be no valid tactical reason for choosing not to object. Defense counsel may have reasonably chosen not to object so that he could respond, as he did, by reminding the jury of the biblical proscription, "Thou shalt not kill." "[C]ompetent counsel may often choose to forgo even a valid objection. '[I]n the heat of a trial, defense counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. The choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal.' [Citation.]" (*People v. Riel* (2000) 22 Cal.4th 1153, 1197 [96 Cal.Rptr.2d 1, 998 P.2d 969].)

We also note that the trial took place before we rendered our decision in *People v. Wrest, supra,* 3 Cal.4th 1088, 1107, in which we clearly condemned the practice of making such biblical references. "Our review [of counsel's conduct] is deferential; we make every effort to avoid the distorting effects of hindsight and to evaluate counsel's conduct from counsel's perspective *at the time.* [Citation.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 541 [71 Cal.Rptr.2d 680, 950 P.2d 1035], italics added.) The record on appeal does not establish that defense counsel's conduct fell below the standard expected of reasonably competent counsel at the time of trial.

In any event, we agree with the People that the biblical references, although improper, were harmless. In *People v. Wrest, supra,* 3 Cal.4th 1088, 1106, the prosecutor referred during his penalty phase argument to "Scripture and verse from the Old Testament that supports capital punishment." We held that "the prosecutor's reference to Old Testament support for capital punishment was improper—such an argument tends to diminish the jury's sense of responsibility for its verdict and to imply that another, higher law should be applied in capital cases, displacing the law in the court's instructions. [Citation.]" (*Id.* at p. 1107.) We concluded that this error was harmless, because it was merely a "brief reference" that was "totally undeveloped in the course of the argument" and because it "came in the course of a long argument, the bulk of which was properly and specifically focused on the factors in aggravation and mitigation." (*Ibid.*)

Although the prosecutor's biblical references in the present case certainly were not "brief" and "undeveloped" as in *People v. Wrest,* they similarly were part of a longer argument that properly focused upon the factors in aggravation and mitigation.

We also found harmless the error discussed in *People v. Sandoval* (1992) 4 Cal.4th 155, 193 [14 Cal.Rptr.2d 342, 841 P.2d 862], affirmed on another

ground *sub nomine Victor v. Nebraska* (1994) 511 U.S. 1 [114 S.Ct. 1239, 127 L.Ed.2d 583], where the prosecutor paraphrased at length Romans 13:107 during his penalty phase argument. This argument was improper, because it invoked "higher or other law as a consideration in the jury's sentencing determination" and exhorted "the jury to consider factors outside section 190.3 in making its penalty determination." (*People v. Sandoval, supra,* 4 Cal.4th at p. 193.) The error was considered harmless, however, because the jury engaged in lengthy deliberations before returning verdicts of life without possibility of parole on three of the counts and death on only one of the counts. (*Id.* at p. 194; cf. *Sandoval v. Calderon* (9th Cir. 2000) 241 F.3d 765 [granting relief on habeas corpus].)

In *People v. Hill* (1998) 17 Cal.4th 800, 836 [72 Cal.Rptr.2d 656, 952 P.2d 673], "the prosecutor tried to explain why the biblical maxim 'Vengeance is mine sayeth the Lord' should not dissuade the jury from imposing the death penalty, for the Bible also says 'an eye for an eye, a tooth for a tooth.' [Fn. omitted.]" This reference was found to be part of a pattern of "serious, blatant and continuous misconduct at both the guilt and penalty phases of trial" that, *together with other errors,* required reversal of the judgment. (*Id.* at p. 844.)

Biblical references that rival in length those in the present case were found harmless in *People v. Wash, supra,* 6 Cal.4th 215, 261, because after making the biblical references, "the prosecutor embarked upon a lengthy and detailed argument devoted exclusively to the evidence in aggravation . . . . He did not return to the subject of God or religion, but instead urged a sentence of death based upon defendant's moral culpability for the crimes in light of the statutory factors. Thus, we do not believe the objectionable remarks could reasonably have diminished the jury's sense of responsibility, or displaced the court's instructions. [Citation.] There is no possibility that the jury would have reached a more favorable verdict had the misconduct not occurred. [Citation.]"

The same is true in the present case. The prosecutor's biblical references during his penalty phase argument were improper but harmless.

C. *Prosecutorial Misconduct—Other Claims*

Defendant argues that the prosecutor committed misconduct during his argument to the first penalty phase jury by stating that any individual juror could "stop the imposition of the death penalty . . . because it has to be a unanimous verdict." Even if we agreed with defendant's contention that the prosecutor's argument was erroneous, he would not be entitled to the remedy

he now seeks—namely, the reversal of the death penalty judgment. As with defendant's claim relating to the first penalty jury's request to address defendant (see *ante*, at pp. 1205-1207), because the first jury did not reach a verdict at the penalty phase, and the second jury returned a verdict that was unaffected by the alleged error upon which defendant now relies, defendant already has been afforded a new penalty trial free from this alleged error. Accordingly, even if we were to conclude that the prosecutor's argument was improper, reversal of the judgment would not be warranted.

Defendant further contends the prosecutor committed misconduct by inviting the jurors to consider "what happened to the victims" and to put themselves "in their shoes." Defendant focuses upon the following portion of the prosecutor's argument: "Think about the sheer terror, think about Eddie Keith, who was driving down the road, looking for the next off-ramp, probably counting the money in his head already that they're going to make on this drug deal, when he hears gunshots go off in the car, and he says, 'Oh, shit.' He realized something's happening and then he gets it in the back of the head. [¶] Put yourself in Jeff DeRouen's shoes when he hears that loud bang in the back seat and he turns to see what's going on and he gets it in the side of the head. You have to look and ask yourself what type of person would do this? What type of person would snuff out two young lives like you and I swat a fly, that fast?"

Defendant forfeited this issue by failing to object on this ground at trial. (*People v. Wrest, supra*, 3 Cal.4th 1088, 1105.) But in any event, the prosecutor's argument was proper. We repeatedly have held that it is proper at the penalty phase for a prosecutor to invite the jurors to put themselves in the place of the victims and imagine their suffering. (*People v. Carpenter, supra*, 15 Cal.4th 312, 415; *People v. Medina* (1995) 11 Cal.4th 694, 778 [47 Cal.Rptr.2d 165, 906 P.2d 2]; *People v. Wash, supra*, 6 Cal.4th 215, 263-264; *People v. Haskett* (1982) 30 Cal.3d 841, 863-864 [180 Cal.Rptr. 640, 640 P.2d 776].)

D. *Shackling*

During selection of the second jury at the penalty phase retrial, the prosecutor brought to the court's attention, outside the presence of the jury, the circumstance that defendant was wearing a leg restraint that the prosecutor described as "a brace that goes from his bottom of his foot up to the knee and he's able to walk fairly normally except for the fact that if he extends his knee or extends his leg as if to run I am advised that the brace would lock and would prevent him from bending or flexing his knee at that point. But as it is now he's able to get up and walk to the jury room and so forth without

any real visible problem other than . . . there is a very small portion of the device which comes over the shoe." The prosecutor observed that the brace was "covered by his pant leg, but there is a part of it showing at the top of his shoes and it's rather obvious when he walks in and out from the jury room because it makes noise and so forth . . . ." The prosecutor was "concerned that some of the jurors are going to think he has polio or something and they're going to be showing him some unwarranted sympathy or something like that, or not believing witnesses when they say they saw Mr. Slaughter running, because obviously he can't run." Defense counsel objected to the use of the leg restraint.

The trial court observed outside the presence of the jury: "In this particular case I, at least, haven't seen any outward reactions by Mr. Slaughter which would indicate to me that he's going to try to hurt me or hurt you or anybody else. But the other problem is the fact that, of course, he is looking at very serious and severe punishment, and he's obviously a young man in good shape and a track star, and I suppose that in and of itself might warrant the device . . . ." The court noted that it appeared that defendant probably would not testify, so he "would not be embarrassed to walk in front of the jury that way."

The bailiff testified that the leg restraint was necessary because defendant had been found guilty of a capital offense and had "nothing to lose by attempting to escape." The bailiff stated than another consideration was that the court was "shorthanded on security." The trial court approved the use of the leg restraint, finding it was "unobtrusive" and "not noticeable by the jury."

"[A] defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints. [Citation.]" (*People v. Duran* (1976) 16 Cal.3d 282, 290-291 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1], fn. omitted.) In the present case, the Attorney General concedes that the trial court abused its discretion in ordering defendant restrained, because no such showing of a manifest need for the leg brace was made, but argues that the error was harmless. We agree.

"We have consistently found any unjustified or unadmonished shackling harmless where there was no evidence it was seen by the jury. [Citations.]" (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 583-584 [15 Cal.Rptr.2d 382, 842 P.2d 1142].) Even a jury's brief observations of physical restraints generally have been found nonprejudicial. (*People v. Duran, supra,* 16 Cal.3d 282, 287, fn. 2; *People v. Tuilaepa, supra,* 4 Cal.4th at p. 584; *People v. Rich* (1988) 45 Cal.3d 1036 [248 Cal.Rptr. 510, 755 P.2d 960].)

In the present case, the leg restraint worn by defendant under his pants was "unobtrusive," and the trial court found that it was "not noticeable by the jury." The restraint was not visible to the jury except for "a very small portion of the device which comes over the shoe." Although the prosecutor stated that the restraint was "rather obvious" because it caused a "noise" when defendant walked, there is no indication in the record that defendant walked in the presence of the jury or that the jury was otherwise made aware that defendant was wearing the device. Nor is it apparent that if the jury was aware of the device, it would conclude that its purpose was to restrain defendant rather than to treat a medical condition such as polio. Defendant did not testify, nor is there any indication in the record that he was dissuaded from testifying by the presence of the leg restraint.

In *People v. Medina* (1990) 51 Cal.3d 870, 898 [274 Cal.Rptr. 849, 799 P.2d 1282], this court held that the trial court's failure to instruct the jury to disregard the defendant's shackles when he testified during the sanity phase of the trial was harmless. We observed that "the risk of substantial prejudice to a shackled defendant is diminished once his guilt has been determined." (*Ibid.*) In the present case, the second penalty phase jury knew that defendant already had been found guilty of murdering two individuals during the commission of a robbery. Under any standard, it does not appear that the jury's penalty phase verdict would have been affected even if the jurors had glimpsed a portion of the device or, having heard a sound as defendant walked, concluded that he was wearing a restraint.

### E. Sympathy Instruction

Defendant contends the trial court erred by instructing the jury at the beginning of the second penalty phase trial that it should not be influenced by sympathy, prejudice, or passion.

As noted above, the first penalty phase ended in a mistrial when the jury was unable to reach a verdict. After a second jury was impaneled, the court read the information, informing the jury that defendant had been convicted as charged. The parties made opening statements that focused upon the circumstances of the offenses, and the prosecution proceeded to present much of the same evidence it had presented during the guilt phase. Following the opening statements, and just before the presentation of evidence, the court gave the jury some brief instructions, including the following: "Ladies and gentlemen of the jury, you have heard the opening statements of counsel and you are going to begin to take evidence in a few minutes. I want you to bear in mind that it's your exclusive duty to decide all questions of fact that are submitted to you in this case. You must determine the effect and value of

the evidence. You must not be influenced in your decision by any sympathy, prejudice or passion toward any party, witness or attorney in this case. . . . [¶] The Court will instruct you at the conclusion of all the evidence of the law that applies in this particular case."

Following four days of proceedings in which evidence was presented concerning the circumstances of the offenses, the prosecution rested its case. Defendant called several witnesses, mostly family members and high school teachers, to testify to his good character. The trial court then further instructed the jury at length. After exhaustively instructing the jury concerning the offenses of which defendant had been convicted by the first jury, the court stated that defendant had been found guilty of murder in the first degree with special circumstances and that the penalty was either death or confinement in the state prison for life without possibility of parole. The court informed the jury: "Under the law of this state, you must now determine which of said penalties shall be imposed upon the defendant. You will now be instructed as to all of the law that applies to the penalty phase of this trial." Among other factors, the court instructed the jury that in determining which penalty to impose, it could consider "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as the basis for a sentence less than death, whether or not related to the offense for which he is on trial. You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle." The jury was instructed to consider as a mitigating circumstance "any fact, condition or event which, as such, does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty" and was told that, in weighing aggravating and mitigating factors, the jury was "free to assign whatever moral or sympathetic value you deem appropriate to each and all of the factors you are permitted to consider."

To determine whether the trial court erred in instructing the jury, "we examine the entire record, including the instructions and arguments, to determine whether the jury was misled to the prejudice of the defendant about the scope of its sentencing discretion. [Citation.] We must ascertain whether, overall, the jury was adequately informed of the full nature of its sentencing responsibility, both as to the manner in which the various factors are to be weighed and as to the scope of its sentencing discretion. [Citation.]" (*People v. Visciotti* (1992) 2 Cal.4th 1, 63 [5 Cal.Rptr.2d 495, 825 P.2d 388].)

In *California v. Brown* (1987) 479 U.S. 538, 539 [107 S.Ct. 837, 838, 93 L.Ed.2d 934], the United States Supreme Court held that an instruction at the penalty phase that the jury " 'must not be swayed by mere

sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling' " did not violate the Eighth Amendment of the federal Constitution. In so holding, the high court found it "highly unlikely that any reasonable juror would almost perversely single out the word 'sympathy' from the other nouns which accompany it in the instruction: conjecture, passion, prejudice, public opinion, and public feeling. Reading the instruction as a whole, as we must, it is no more than a catalog of the kind of factors that could improperly influence a juror's decision to vote for or against the death penalty. . . . [A] rational juror could hardly hear this instruction without concluding that it was meant to confine the jury's deliberations to considerations arising from the evidence presented, both aggravating and mitigating." (*California v. Brown, supra,* 479 U.S. at pp. 542-543 [107 S.Ct. at p. 840].)

Considering the jury instructions as a whole, the jury certainly understood that it must consider all mitigating evidence and that it could view that evidence sympathetically. The court initially instructed the jury that it was about to hear the evidence, that it was the jury's duty to "decide all questions of fact," that it "must determine the effect and value of the evidence," and that it "must not be influenced in your decision by any sympathy, prejudice or passion." The court added that it would "instruct [the jury] at the conclusion of all the evidence of the law that applies in this particular case." At the conclusion of the evidence, the court instructed the jury that it could consider "any other circumstance which extenuates the gravity of the crime . . . and any sympathetic or other aspect of the defendant's character or record." The jury further was instructed to consider as a mitigating circumstance any "extenuating circumstance" and was told that it was "free to assign whatever moral or sympathetic value you deem appropriate to each and all of the factors you are permitted to consider." Taken as a whole, the jury properly was instructed as to the scope of its sentencing discretion. (See *People v. Clark* (1992) 3 Cal.4th 41, 163-164 [10 Cal.Rptr.2d 554, 833 P.2d 561]; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1225-1226 [275 Cal.Rptr. 729, 800 P.2d 1159].)

### F. *Instruction to View Defendant's Statement with Caution*

Defendant, repeating the argument he made with reference to the guilt phase, claims that the trial court erred at the penalty phase retrial in instructing the jury pursuant to CALJIC No. 2.71 that "evidence of an oral admission of a defendant should be viewed with caution." As we have explained, *ante,* at pages 1199-1201, defendant could not have been prejudiced by the giving of this instruction.

### G. *Trial Court's Comment During Voir Dire*

During voir dire at the second penalty phase trial, the court questioned a prospective juror concerning one of his answers on the juror questionnaire:

"[Trial Court]: When you were asked, question number 27, express your views of the death penalty, you indicated, 'Unless it was in self-defense or to retaliation [*sic*] against abuse that it should be the death penalty.' That of course is not the law. But do you feel you could follow the law as I would instruct you at the end of the case?

"A. Yes, I do.

"Q. This—the evidence I don't think will show either one of those situations took place, but could you listen to the evidence and depending upon what the evidence showed vote for the death penalty?

"A. Yes.

"Q. Could you listen to all the evidence and depending on what the evidence showed also vote for life imprisonment?

"A. Yes.

"Q. So you could vote either way depending upon the evidence which you would hear or see in this courtroom?

"A. Yes."

Defendant asserts that the court's comment, that "the evidence I don't think will show either" self-defense or retaliation against abuse, constituted an erroneous and prejudicial comment on the evidence. The Attorney General asserts that defendant forfeited this issue by failing to object at trial to the court's comment. (See *People v. Saunders* (1993) 5 Cal.4th 580, 589-590 [20 Cal.Rptr.2d 638, 853 P.2d 1093].) Defendant responds that no objection was required, because Code of Civil Procedure section 647 provides that "any statement or other action of the court in commenting upon or in summarizing the evidence" is "deemed to have been excepted to." (*Delzell v. Day* (1950) 36 Cal.2d 349, 351 [223 P.2d 625].) Assuming, without deciding, that the issue may be raised on appeal, we conclude that the trial court's remark did not constitute an improper comment on the evidence.

Article VI, section 10, of the California Constitution provides, in pertinent part: "The court may make such comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause." We examined this provision in *People v. Rodriguez* (1986) 42 Cal.3d 730, 766 [230 Cal.Rptr. 667, 726 P.2d 113],

stating: "On its face, the constitutional language imposes no limitations on the content or timing of judicial commentary, deferring entirely to the trial judge's sound discretion. The appellate courts have recognized, however, that this powerful judicial tool may sometimes invade the accused's countervailing right to independent jury determination of the facts bearing on his guilt or innocence. Hence, the decisions admonish that judicial comment on the evidence must be accurate, temperate, nonargumentative, and scrupulously fair. The trial court may not, in the guise of privileged comment, withdraw material evidence from the jury's consideration, distort the record, expressly or impliedly direct a verdict, or otherwise usurp the jury's ultimate factfinding power. [Citations.]" (See also *People v. Hawkins* (1995) 10 Cal.4th 920, 948 [42 Cal.Rptr.2d 636, 897 P.2d 574] ["In the present case, the trial court's questions and comments were within the bounds of propriety. Its role was one of clarification rather than advocacy."].)

The trial court's single remark that it did not believe the evidence would show self-defense or retaliation against abuse was proper under the foregoing standard. The remark was accurate and did not distort the record. By convicting defendant of murder, the jury at the guilt phase had determined that the evidence did not establish self-defense. The remark was temperate, nonargumentative, and scrupulously fair. The court stated what it thought the evidence would demonstrate, but asked whether the juror could "listen to the evidence" and base his verdict "upon what the evidence showed." The court did not withdraw material evidence from the jury's consideration, expressly or impliedly direct a verdict, or otherwise usurp the jury's ultimate factfinding power. To the contrary, the court concluded by posing the question: "So you could vote either way depending upon the evidence which you would hear or see in this courtroom?" Furthermore, the court clearly was attempting to protect defendant's rights by determining whether the juror could vote for either penalty, depending upon the facts to be presented. The court's isolated remark, made during jury selection and prior to the receipt of any evidence by the second jury, was not error. (Cf. *People v. Flores* (1971) 17 Cal.App.3d 579, 588 [95 Cal.Rptr. 138].)

H. *Reference to the Governor's Pardon Power*

Defendant contends the trial court, in answering a question from the *first* penalty phase jury during deliberations, erred in referring to the Governor's power to grant a reprieve, pardon, or commutation. We need not determine whether the trial court erred in this regard, because any such error would be harmless. As we have discussed, the first penalty phase jury did not reach a verdict, a mistrial was declared, and a new jury was impaneled. The second jury returned a verdict that was unaffected by the alleged error upon which

defendant now relies. Accordingly, even if we were to conclude that the trial court erred in answering the jury's question, reversal of the judgment would not be warranted.

### I. Lingering Doubt Instruction

Defendant contends the trial court erred in failing to instruct the jury, sua sponte, on lingering doubt at both the first and second penalty phase trials. As to the first penalty phase, any such error could not have affected the judgment for the reasons discussed above. As to the second penalty phase, we repeatedly have held that although it is proper for the jury to consider lingering doubt, there is no requirement that the court specifically instruct the jury that it may do so. (*People v. Staten* (2000) 24 Cal.4th 434, 464 [101 Cal.Rptr.2d 213, 11 P.3d 968]; *People v. Millwee* (1998) 18 Cal.4th 96, 166 [74 Cal.Rptr.2d 418, 954 P.2d 990].)

### Other Alleged Errors

### A. Ineffective Assistance of Counsel

Defendant contends he received ineffective assistance of trial counsel in several respects. ■ "To establish ineffective assistance of counsel under either the federal or state guarantee, a defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that counsel's deficient performance was prejudicial, i.e., that a reasonable probability exists that, but for counsel's failings, the result would have been more favorable to the defendant. [Citations.]" (*People v. Resendiz* (2001) 25 Cal.4th 230, 239 [105 Cal.Rptr.2d 431, 19 P.2d 1171].) On appeal, " '[i]f the record sheds no light on why counsel acted or failed to act in the manner challenged, "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," [citation], the contention [that counsel provided ineffective assistance] must be rejected.' " (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1058 [5 Cal.Rptr.2d 230, 824 P.2d 1277].)

■ Defendant contends trial counsel was ineffective in failing to peremptorily challenge Juror F., because she stated during voir dire of the original jury that she strongly approved of capital punishment and once had circulated a petition urging reinstatement of the death penalty. The record on appeal sheds no light on why trial counsel did not peremptorily challenge Juror F., and it is not the case that there could be no satisfactory explanation. " 'Because the use of peremptory challenges is inherently subjective and intuitive, an appellate record will rarely disclose reversible incompetence in

this process.' [Citation.]" (*People v. Freeman* (1994) 8 Cal.4th 450, 485 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888].) Although Juror F. expressed support for the death penalty, she stated she was not biased and would not automatically vote for the death penalty. She had circulated the petition approximately 20 years ago, and stated she is not a member of any group advocating the death penalty. Trial counsel personally questioned Juror F. and observed her demeanor. Counsel may well have had a valid, tactical reason for choosing not to peremptorily challenge Juror F., including a possible concern as to who might replace her in the jury box. (*People v. Lucas* (1995) 12 Cal.4th 415, 480, 481 [48 Cal.Rptr.2d 525, 907 P.2d 373]; see also *People v. Kipp* (1998) 18 Cal.4th 349, 367-368 [75 Cal.Rptr.2d 716, 956 P.2d 1169].) To the extent defendant contends this alleged error affected the penalty phase, the failure of trial counsel to peremptorily challenge Juror F. could not have prejudiced defendant, because the jury of which Juror F. was a part failed to reach a verdict at the first penalty phase trial. Juror F. was not a member of the second jury that returned the verdict of death.

■ Defendant asserts trial counsel was ineffective in agreeing to have the prosecutor give his closing argument at the guilt phase on Friday afternoon, with the remaining arguments to be given the following Monday. This contention fails, because the record on appeal sheds no light on why trial counsel agreed to this arrangement, and counsel may have had a valid tactical reason for his decision. Counsel might not have wanted to interrupt his argument with a weekend recess, and may have wanted to have the weekend to digest the prosecutor's argument and prepare a rebuttal. Counsel may have decided the jury would be fatigued on Friday afternoon, would have difficulty being attentive, and might be more receptive to counsel's argument on Monday morning.

Defendant contends trial counsel was ineffective in failing to object to the court's statement during voir dire of the second penalty phase jury that the evidence would not establish self-defense. As we explained above, the court's statement was not improper, so an objection would have been unwarranted. (*Ante*, at pp. 1216-1218.)

Defendant asserts that trial counsel was ineffective in failing to enter a plea of once in jeopardy prior to the commencement of the penalty phase retrial. Defendant reasons that the trial court erred in declaring a mistrial at the first penalty phase trial, because the court erroneously refused the jury's request to address defendant. Defendant argues that trial counsel should have entered a plea of once in jeopardy before the second penalty phase trial to preserve this issue for review. This contention fails because, as explained above, whether or not the trial court erred in denying the jury's request to

address defendant, when the jury thereafter announced that it was unable to reach a verdict, the trial court properly declared a mistrial. (*Ante*, at p. 1207.)

Defendant maintains that trial counsel should have requested that the jury be instructed pursuant to CALJIC No. 3.18 that Littleton was an accomplice and that therefore his testimony should be viewed with distrust. This argument fails because, as discussed above, the evidence does not support a finding that Littleton was an accomplice of defendant's. (*Ante*, at pp. 1201-1203.)

During closing argument at the first penalty phase trial, the prosecutor told the jury: "Any one of you can stop the imposition of the death penalty. You have that power because it has to be a unanimous verdict. Any one of you can stop that." Defendant contends trial counsel was ineffective in failing to object on the ground that this statement was misleading, reasoning that an individual juror cannot "stop" imposition of the death penalty because there may be a penalty phase retrial if the jury is unable to reach a verdict. As noted above, because the first penalty phase jury was unable to reach a verdict, a mistrial was declared, and a new penalty phase jury was impanelled, defendant was not prejudiced. (*Ante*, at pp. 1211-1212.)

Defendant contends trial counsel was ineffective in failing to object to the prosecutor's argument that the jurors should put themselves "in the shoes" of the victims. As noted above, the prosecutor's argument was proper. (*Ante*, at p. 1212.)

Defendant contends trial counsel was ineffective in failing to object when the court instructed the jury at the commencement of the second penalty phase trial that it "must not be influenced in [its] decision by any sympathy, prejudice or passion." As explained above, the court's instructions, taken as a whole, were proper. (*Ante*, at pp. 1214-1216.)

Defendant contends trial counsel was ineffective in failing to object to the trial court's instructions at the guilt phase and the penalty phase retrial that the jury should view with caution defendant's admissions. As explained above, the trial court erred in giving this instruction, but the error was harmless. (*Ante*, at pp. 1199-1201.)

Defendant contends trial counsel was ineffective in failing to have defendant's testimony at the guilt phase read to the second penalty phase jury, or to have defendant testify at the second penalty phase trial. This contention fails, because the record on appeal sheds no light on why trial counsel chose not to present defendant's testimony in either manner, and

counsel may have had a valid tactical reason for not presenting this evidence. At the guilt phase, defendant presented exculpatory testimony to establish that he acted in self-defense and did not need the money from the alleged robbery to purchase the automobile he acquired shortly after the murders, because he had received an insurance payment for a stolen truck and had other sources of funds. But defendant's testimony concerning the insurance payments and other funds was substantially impeached by the prosecution. If trial counsel, at the penalty phase retrial, had presented defendant's testimony, the prosecution again could have presented this impeaching evidence to demonstrate that defendant was lying. Trial counsel chose instead to present defendant's claim of self-defense to the second jury through the testimony of a police detective who recounted out-of-court statements made by defendant following his arrest, and through a tape recording of those statements that was played to the jury. Nothing in the record on appeal suggests that this tactical decision was unreasonable.

Defendant asserts that trial counsel was ineffective in failing to request that the second penalty phase jury be instructed on lingering doubt. As we have observed, *ante,* at page 1219, defendant has no state or federal constitutional right to such an instruction, and trial counsel reasonably may have concluded that such a request would be futile. (*People v. Medina, supra,* 11 Cal.4th 694, 774.)

### B. *Cumulative Effect*

Defendant contends that this court should set aside his death sentence and order a sentence of life imprisonment without the possibility of parole because of the cumulative effect of "numerous" errors alleged to have been committed during the first penalty phase trial. We disagree. Errors during that proceeding would not provide a basis for reversing the judgment of death based upon the second penalty phase trial. (See *ante,* at p. 1207.)

### C. *Motion for Modification of the Death Verdict*

Defendant contends that, as a matter of law, the trial court erred in denying his automatic motion for modification of the death verdict (§ 190.4, subd. (e)), because the court failed to consider properly the aggravating and mitigating circumstances. Defendant interprets the court's observation that "[t]here has been very little remorse" as a finding that defendant had some remorse, which would be a circumstance that must be considered as a mitigating factor. In denying the motion to modify the death verdict, the court stated: "There has been very little remorse. In fact, all the evidence pointed to the fact that the main interest the defendant had was in buying the

car and trying to learn if he could recover the car after he was taken into custody." It is clear that the import of the court's comments was that defendant exhibited little or no remorse. This conclusion is amply supported by the record. As the trial court recognized, defendant arranged a sham drug deal for the sole purpose of robbing and killing the victims. He shot three individuals, killing two of them, and only hours later used the money he stole to purchase a sports car. The trial court properly concluded that defendant exhibited no appreciable remorse. (*People v. Ochoa* (2001) 26 Cal.4th 398, 449 [110 Cal.Rptr.2d 324, 28 P.3d 78]; *People v. Mendoza, supra,* 24 Cal.4th 130, 187.)

Defendant contends the trial court failed to consider the absence of violent criminal activity or felony convictions as mitigating factors. This contention is not supported by the record. The trial court stated: "190.3 [factor] (b) requires that the Court consider the presence *or absence* of criminal activity of the defendant which involved the use or attempted use of force or violence or the express or implied threat to the use of [*sic*] force or violence. There was no evidence on this issue. [¶] 190.3 [factor] (c) The presence *or absence* of any felony conviction. There was no evidence presented of a prior felony conviction." (Italics added.) The court, therefore, was aware of the absence of evidence of violent criminal activity or of a felony conviction, and also was aware that it was to consider the absence of such evidence as a mitigating factor. We perceive no error.

Defendant contends the court erred in observing that defendant "was young," but in concluding, "I don't think that the age was relevant on this issue." Defendant was 19 years of age at the time of the crime. But his crime was not an immature or spontaneous act. Rather, it was a calculated, carefully planned multiple murder committed for financial gain. Under these circumstances, the trial court did not abuse its discretion in concluding that defendant's age was not a significant factor.

D. *Cumulative Error*

Defendant contends that the cumulative effect of numerous errors alleged to have been committed during the trial requires reversal of the judgment. The only errors we have identified involve the instruction given by the court at the guilt phase and the penalty phase retrial directing the jury to view defendant's extrajudicial statement with caution (*ante*, at pp. 1199-1201), and the requirement that defendant wear a leg restraint during the penalty phase retrial (*ante*, at pp. 1212-1214). Considered individually or together, these errors were harmless.

E. *Second Penalty Phase Trial*

Defendant contends it was improper for the second penalty phase jury to return a verdict of death, because the second jury had not heard all of the evidence presented during the guilt phase of the trial. We rejected an identical contention in *People v. Hawkins, supra,* 10 Cal.4th 920, 966.

F. *Penalty Phase Factors*

Defendant asserts that the factors set forth in section 190.3 to guide the jury's determination whether to impose the death penalty are unduly vague. We rejected this contention in *People v. Anderson* (2001) 25 Cal.4th 543, 601 [106 Cal.Rptr.2d 575, 22 P.3d 347].

Specifically, defendant contends that factor (a) of section 190.3, which directs the jury to consider the circumstances of the offense, is unduly vague. The United States Supreme Court held otherwise in *Tuilaepa v. California* (1994) 512 U.S. 967, 975-980 [114 S.Ct. 2630, 2637-2639, 129 L.Ed.2d 750]. (*People v. Anderson, supra,* 25 Cal.4th 543, 601.)

Defendant contends it was error to instruct the jury without specifying which factors were aggravating and which were mitigating, and without limiting the possible aggravating factors to those listed. We have rejected these contentions. (*People v. Anderson, supra,* 25 Cal.4th 543, 601.)

 Defendant, arguing that the court's instructions permitted the jury to consider his youth as an aggravating factor, points to the prosecutor's argument that defendant "was certainly old enough to know better." "Chronological age, however, is neither aggravating nor mitigating, 'but is used in the statute "as a metonym for any age-related matter suggested by the evidence or by common experience . . . ." ' [Citation.] The prosecutor's argument here that defendant was old enough to understand the wrongfulness of his conduct is a permissible age-related inference." (*People v. Mendoza, supra,* 24 Cal.4th 130, 190, italics omitted.)

Defendant faults the instruction directing the jury to consider "extreme mental or emotional disturbance"—both because it fails to specify that this is a mitigating factor, and because it precludes the jury from considering as a mitigating factor a mental or emotional disturbance that is less than "extreme." The United States Supreme Court upheld the validity of this instruction in *Tuilaepa v. California, supra,* 512 U.S. 967, 976-977 [114 S.Ct. 2630, 2637]. (*People v. Anderson, supra,* 25 Cal.4th 543, 601.)

Defendant contends that the jury should have been required to find beyond a reasonable doubt each of the following: the existence of any factor in

aggravation, that the aggravating factors outweighed the mitigating factors, and that death was the appropriate penalty. We rejected these arguments in *People v. Anderson, supra*, 25 Cal.4th 543, 601.

Defendant contends the jury should have been required to return unanimous written findings supporting its verdict. We have rejected this contention. (*People v. Anderson, supra*, 25 Cal.4th 543, 601.)

Defendant contends California should require intercase proportionality review to determine whether the death verdict in the present case is disproportionate to the penalty imposed in similar cases. We have rejected this contention. (*People v. Anderson, supra*, 25 Cal.4th 543, 602.)

Repeating previous arguments, defendant claims California's death penalty laws are unconstitutional because they fail to contain certain "safeguards," such as requiring written, unanimous findings beyond a reasonable doubt that aggravating factors exist, that they outweigh the mitigating factors, and that death is the appropriate penalty. We have considered and rejected each of these contentions above. (*Ante*, at pp. 1224-1225.)

Defendant contends that California's death penalty law fails to narrow the class of persons eligible for the death penalty, because the special circumstances included in section 190.2 are so numerous and broad in scope as to include nearly every first degree murder. We have rejected this contention. (*People v. Box, supra*, 23 Cal.4th 1153, 1217.) Defendant argues that it is improper for a special circumstance also to constitute an aggravating factor. We have rejected this argument. (*People v. Millwee, supra*, 18 Cal.4th 96, 164.)

Defendant contends the California death penalty law is unconstitutional because it vests complete discretion in the prosecutor to determine whether to seek the death penalty. We rejected this contention in *People v. Earp* (1999) 20 Cal.4th 826, 905 [85 Cal.Rptr.2d 857, 978 P.2d 15].

CONCLUSION

The judgment of death is affirmed.

Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—I join the majority in affirming the judgment insofar as it determines defendant's guilt and the truth of the special circumstance allegations, but I do not join in affirming the judgment insofar as it imposes the death penalty.

Here, as in *People v. Wash* (1993) 6 Cal.4th 215 [24 Cal.Rptr.2d 421, 861 P.2d 1107] (*Wash*), the prosecutor engaged in egregious misconduct during his argument to the jury at the penalty phase by invoking biblical authority for a verdict of death. Here, as in *Wash*, the failure of defendant's trial attorney to object to this misconduct denied defendant his constitutional right to the effective assistance of counsel. Here, as in *Wash*, the penalty issue was close, as shown by the absence of evidence that defendant had previously committed any violent crime and by the first jury's inability to agree on a penalty verdict. Here, as in *Wash*, after reviewing the record, I am unable to conclude with confidence that if defense counsel had acted effectively to prevent the prosecutor's improper argument, the jury nonetheless would have returned a verdict finding the appropriate punishment for defendant's crimes to be death rather than imprisonment for life without possibility of parole. (*Wash, supra,* at p. 279 (conc. & dis. opn. of Kennard, J.).)

The prosecutor's entire biblical argument is quoted in the majority opinion (maj. opn., *ante*, at pp. 1208-1209) and need not be quoted in full again here. Of particular significance, the prosecutor claimed to find in the Bible the concepts that "[c]apital punishment for murder is necessary in order to preserve the sanctity of human life and only the severest penalty of death can underscore the severity of taking life." The prosecutor also claimed biblical authority for the proposition that if a person "kills by treachery, an intentional, cold-blooded killer," that person "shall be put to death." The argument was egregious misconduct because it suggested that under divine law the proper penalty for defendant's crimes is death, always and automatically, regardless of the balance of aggravating and mitigating circumstances. (See *Romine v. Head* (11th Cir. 2001) 253 F.3d 1349, 1366-1371 [prosecutor's argument using biblical references suggesting death was mandatory penalty was prejudicial misconduct].)

The majority agrees that the prosecutor's argument was improper. (Maj. opn., *ante*, at p. 1210.) But the majority decides that this misconduct does not warrant reversal of the judgment for two reasons. First, in the majority's view, defendant forfeited his right to assert this claim because his trial counsel did not object to the improper argument, and the appellate record does not show that counsel was ineffective for failing to do so. (*Id.* at pp. 1209-1210.) Second, in the majority's view, the prosecutor's improper argument was harmless because it was "part of a longer argument that properly focused upon the factors in aggravation and mitigation." (*Id.* at p. 1210.) I find neither reason persuasive.

As in *Wash,* defendant's trial counsel rendered ineffective assistance by not objecting to the prosecutor's reliance on biblical authority for a death verdict. What I wrote in my separate opinion in *Wash* applies also here:

"As the high court has explained, in order to amount to constitutionally ineffective assistance, an attorney's act or omission must fall below an objective standard of reasonableness under prevailing professional norms, and must have resulted in prejudice to the defendant. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693, 104 S.Ct. 2052].)

"Defense counsel's failure to object to the prosecutor's extensive argument that defendant should be put to death based on biblical principles is inexcusable. Although we have stated that a failure to object to a prosecutor's argument 'seldom' establishes incompetence (*People* v. *Ghent* (1987) 43 Cal.3d 739, 772 [239 Cal.Rptr. 82, 739 P.2d 1250]), in this case there could be no legitimate tactical justification for counsel's failure to object to the prosecutor's dramatic and specific biblical argument. We cannot say here, as we could in *Ghent*, that '[c]ounsel may well have tactically assumed that an objection or request for admonition would simply draw closer attention to the prosecutor's isolated comments.' (*Id.* at p. 773.) Here, the prosecutor's religious argument was not isolated, but expansive and fully developed. No objection could have drawn any closer attention to this main theme of the prosecutor's argument [than] the prosecutor had drawn himself." (*Wash, supra,* 6 Cal.4th at p. 282 (conc. & dis. opn. of Kennard, J.).)

To support its conclusion that the record does not demonstrate ineffective assistance of counsel, the majority offers this reasoning: "Defense counsel may have reasonably chosen not to object so that he could respond, as he did, by reminding the jury of the biblical proscription, 'Thou shalt not kill.' " (Maj. opn., *ante,* at p. 1210.) The majority offered similar reasoning in *Wash,* and I responded this way: "[I]t is improper to answer one impermissible argument not based on the facts or the law applicable to the case with another impermissible argument not based on the facts or the law applicable to the case. A religious argument against the death penalty is no more acceptable at the penalty phase of a capital case than a religious argument in favor of the death penalty. (*People* v. *Sandoval* (1992) 4 Cal.4th 155, 194 [14 Cal.Rptr.2d 342, 841 P.2d 862] ['What is objectionable is reliance on religious authority as supporting or opposing the death penalty. The penalty determination is to be made by reliance on the legal instructions given by the court, not by recourse to extraneous authority.']; *Commonwealth* v. *Daniels* (1992) 531 Pa. 210 [612 A.2d 395, 404] [same].) Our courts are not ecclesiastical courts, and our juries do not base their decisions on religious law no matter whom such law may be said to favor. Because arguments by both the prosecutor and defense counsel exceeded the bounds of inferences that may be drawn from the evidence and considerations that may properly be brought to bear under the factors specified in the death penalty statute, both arguments were improper. It follows that defense counsel's decision to

respond to the prosecutor's religious argument by relying on opposing religious authority cannot be considered a legitimate tactical choice that would excuse his failure to object to the prosecutor's impermissible religious argument." (*Wash, supra,* 6 Cal.4th at p. 283 (conc. & dis. opn. of Kennard, J.).)

The remaining question here is whether defendant was prejudiced by his trial attorney's inexcusable failure to object to the prosecutor's improper argument. In turn, this requires an examination of the prejudicial effect of the prosecutor's argument.

In comparison with other capital cases this court has seen, the prosecutor's case in aggravation was not particularly strong. Although defendant murdered two people for the purpose of robbing them of the money with which they had planned to buy illegal drugs, he was only 19 years old at the time and the prosecution presented no evidence that he had prior felony convictions or had committed prior acts of violence.

In mitigation, the defense called eight witnesses—four members of defendant's family, two of his friends, and a vice-principal and a counselor from his high school—who described defendant's positive qualities. Defendant's high school counselor also described how defendant had been emotionally affected by the separation of his parents and the departure of his mother from their home. That the penalty issue was close is shown by the result of the first penalty trial when, in response to largely the same evidence, the jury was unable to reach any penalty verdict.

The majority's assertion that the prosecutor's improper argument must be considered harmless because it was "part of a longer argument that properly focused upon the factors in aggravation and mitigation" (maj. opn., *ante,* at p. 1210) makes little sense. Under that logic, prosecutors may freely refer to biblical authority when making their penalty arguments to juries in capital cases, secure in the knowledge that this court will never reverse a resulting death judgment for this misconduct, provided only that the prosecutors also present an argument focusing on the statutory aggravating and mitigating factors. Appeals to divine authority in jury arguments in capital cases are prejudicial when jurors for whom the aggravating and mitigating factors appear closely balanced use religious considerations to resolve their doubts, as the prosecutor's improper argument invites them to do. This may well have occurred here.

Having examined the appellate record, I cannot say with reasonable confidence that the jury would have returned the death verdict if the prosecutor had refrained from making, or a timely defense objection had prevented him from making, an improper jury argument appealing to religious

authority as mandating the death penalty. Accordingly, I would reverse the judgment of death as to penalty.

Moreno, J., concurred.

Appellant's petition for a rehearing was denied July 17, 2002. Brown, J., did not participate therein. Kennard, J., was of the opinion that the petition should be granted.