Filed 5/24/13  P. v. Holmes CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B239704 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA115993) |
| v. | |
| CHARLES HOLMES, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Arthur M. Lew, Judge.  Affirmed.

Charlotte E. Costan, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Charles Holmes, Jr., appeals from the judgment entered following his convictions by jury on count 1 – first degree murder (Pen. Code, § 187) with personal and intentional discharge of a firearm, and personal and intentional discharge of a firearm causing great bodily injury and death (Pen. Code, § 12022.53, subds. (d) & (e)(1)) with a finding he committed the murder for the benefit of a criminal street gang (former Pen. Code, § 186.22, subd. (b)), and on count 2 – dissuading a witness (Pen. Code, § 136.1, subd. (a)(1)) with a court finding that he suffered two prior felony convictions (Pen. Code, § 667, subd. (d)). The court sentenced appellant to prison for 125 years to life. We affirm the judgment.[1]

## FACTUAL SUMMARY

1. *People's Evidence.*

Viewed in accordance with the usual rules on appeal (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established that Demond Vaughn was an East Coast Crips gang (ECC) member whose moniker was Boss Hog. Vaughn was a snitch, i.e., he provided information to law enforcement authorities, and he had a reputation for being a snitch.[2] ECC had indicated Vaughn was to be stabbed or killed for being a snitch. Vaughn met Johnny Ray Thomas (the decedent) in prison. Thomas was an ECC member. After the two left prison they were close friends. However, Vaughn avoided ECC territory.

On February 24, 2010, Vaughn, Thomas, Mercedes Spraggins, and Ramona McClinton were at McClinton's house near 48th and Hoover. Spraggins was Vaughn's girlfriend and McClinton was Thomas's girlfriend. The four discussed going out. Vaughn, Thomas, and Spraggins left in Thomas's Tahoe SUV (Tahoe) to pick someone up. They drove to 116th and Towne, a location in the "hood" where Vaughn did not want

---

[1] On February 14, 2013, appellant filed a petition for a writ of habeas corpus (case No. B246863) and, on February 25, 2013, this court ordered that this appeal and the petition be concurrently considered. The petition will be the subject of a separate order.

[2] In 2003, Vaughn provided information about a gun transaction and two persons whose monikers were Biscuit and Slim, respectively.

to be. Thomas entered a building while Vaughn and Spraggins remained in the Tahoe. About 10 minutes later, Thomas returned with appellant, known as Slim, and Calvin Thomas (Calvin), known as Frog. Vaughn did not know appellant but Vaughn had seen appellant before in the neighborhood when Vaughn was young. Appellant was a high-ranking ECC member.

Appellant came to the driver's side window of the Tahoe, and appellant and Vaughn greeted each other. Vaughn was uncomfortable. The following occurred during the People's direct examination of Vaughn: "Q Did you see a reaction in the defendant? [¶] A Yeah, he just looked at me. Like just wow! It was just like wow!" Vaughn identified appellant at trial as the person whom Vaughn had seen.

Appellant told Thomas to meet appellant at a store. Appellant was driving an undamaged SUV. The SUV was depicted in a photograph, i.e., People's exhibit No. 9. Thomas, in the Tahoe with Vaughn and Spraggins, followed appellant. Thomas drove to a liquor store at Century and Main, then, at appellant's request, to 102nd and San Pedro, which was in ECC territory. At trial, Vaughn positively identified appellant as the person named Slim whom Vaughn had seen driving, on February 24, 2010, the SUV depicted in People's exhibit No. 9.[3] Vaughn never saw anyone else drive that SUV. Thomas parked near the SUV and exited the Tahoe.

Thomas was later talking to appellant when Thomas asked Vaughn to approach. Vaughn exited the Tahoe and went to the driver's side of appellant's SUV. Appellant was sitting in its driver's seat. Vaughn and appellant conversed. Thomas left appellant's SUV and spoke with Calvin while Vaughn remained talking with appellant.

---

[3] During cross-examination, Vaughn testified that on the morning after Thomas was killed, Vaughn spoke with Los Angeles Police Detective Stacey Szymkowiak. Vaughn told her that he first met appellant in 2001 or 2002 in connection with a gun case involving Biscuit. However, Vaughn acknowledged at trial that he had not known that appellant had been in prison from 1998 to 2009. Vaughn also acknowledged appellant could not have been the person named Slim whom Vaughn had met in connection with the gun case, and the person involved in the gun case must have looked like appellant. Appellant had worked on many cases with law enforcement authorities.

3

Appellant suddenly asked Vaughn if Vaughn had a gun on him. Vaughn replied no. Appellant exited appellant's SUV and eventually appellant, Vaughn, Thomas, and Calvin walked to a "homie's" house. Later, the four were outside the house. Vaughn noticed people putting on black clothes, black hoodies, and black gloves. Vaughn knew it was "about [him]." Appellant called to Thomas and the two conversed. At the time, Thomas had his back to Vaughn. Thomas turned, faced Vaughn, and looked at Vaughn in a way that signaled to Vaughn to leave. Vaughn left shortly thereafter.

During the morning of February 25, 2010, Vaughn saw on television that the SUV appellant had been driving had been involved in a crash. Police showed Vaughn a Department of Motor Vehicles (DMV) photograph and Vaughn identified it as depicting appellant from ECC.

Spraggins testified as follows. On February 24, 2010, Thomas drove Vaughn and Spraggins in Thomas's truck. They eventually went to Vaughn's old neighborhood, which was "in the hundreds." Thomas exited the truck but Vaughn remained in it. Thomas returned with appellant and Calvin. Spraggins did not know appellant before that night. Calvin was Thomas's uncle.

After Thomas returned with Calvin and appellant, appellant stuck his head in Thomas's truck and greeted Vaughn and Spraggins. Appellant had a mustache and goatee, his hair was in braids, and he was wearing a red shirt.[4] Spraggins positively identified appellant at trial as the person who looked into the window of Thomas's truck in which she had been seated that night.[5] Appellant walked away and talked with Calvin. Thomas

---

[4]     Calvin testified he was an ECC member, Calvin saw appellant regularly, and, in February 2010, appellant was wearing braids.

[5]     During recross-examination, appellant asked Spraggins if she remembered saying (to detectives) that the person whom she saw quickly glanced up at her, then turned. She replied, "Yeah, I was still looking at him. Just because he turned doesn't mean I can't dentify him." Appellant asked if Spraggins told police that "[the person] looked at [Spraggins] real quickly and then turned away," and she replied, "Yes, he looked, and he looked toward the back of the car."

4

reentered his truck, and Thomas, Vaughn, and Spraggins followed appellant and Calvin. Appellant was driving the SUV depicted in People's exhibit No. 9. Thomas eventually drove to 102nd and parked.

Spraggins observed Thomas cross the street and talk to appellant. Spraggins and Vaughn stayed in the Tahoe. Thomas invited Vaughn to exit the Tahoe and Vaughn reluctantly did so. Appellant and Thomas conversed, and Vaughn walked to appellant and talked with him. Appellant, Vaughn, Thomas and Calvin then walked down the street to a house. When the four returned, Thomas and appellant walked towards appellant's truck and talked. Vaughn told Spraggins that he was going to his sister's house, and Vaughn left. Thomas was still with appellant. Thomas returned to his SUV, looked inside it, and asked where Vaughn was. Thomas then returned to appellant.

During cross-examination, Spraggins testified she was sitting in the front seat of Thomas's truck and operating a laptop computer. However, she denied at trial that it was safe to say she was not paying much attention to what "the guys" were doing. She testified she was "still paying attention" even though she was doing something.

A few minutes after Thomas returned to appellant, Thomas came back to his truck and drove away with Spraggins. Spraggins first learned appellant was named Slim when Thomas reentered the truck. Almost two hours had passed from the time Spraggins first saw appellant to the time she left 102nd with Thomas.

Thomas, driving with Spraggins, was very upset. Spraggins heard Thomas and appellant talking on Thomas's cellphone. Thomas was using his speakerphone, and Spraggins heard the following. Appellant kept asking where Thomas and Spraggins were. Appellant said he wanted "that nigga," referring to Vaughn, and appellant said he "wanted [Vaughn's] head." Appellant asked where Vaughn was. Thomas replied Vaughn was not with them anymore. Appellant wanted to know where Spraggins was. Thomas replied he had dropped her off.

Thomas had about 10 phone conversations, and only one was on the speakerphone. Thomas's phone rang incessantly. While Thomas was driving, he told Spraggins that Vaughn was a snitch. Thomas drove to his mother's house and entered it with Spraggins.

5

Thomas's cellphone continued ringing. Thomas was pacing back and forth when he was on the phone. He was worried and upset. When it was very late, Thomas left his mother's house. He told the occupants not to open the door. Later that night, Thomas called and asked Spraggins to pick him up.

About 30 minutes later, Spraggins went to 102nd and San Pedro. Police were present. Spraggins returned to Thomas's mother's house. Spraggins saw on television Thomas's body and a crashed vehicle. The crashed vehicle was the SUV appellant had been driving.

About 2:05 a.m. on February 25, 2010, McClinton received a phone call from Thomas. He was hysterical and wanted her immediately to come to 102nd and San Pedro and get him. She drove to the intersection, which was about 10 minutes away. While McClinton was en route, Thomas called her and wanted to know where she was. McClinton testified that after she told Thomas where she was, Thomas told her to wait, then she heard Thomas say on the phone, "Nigga Slim, if you feel like that, then take off." Thomas's voice was raised and he was angry. The following occurred during the People's direct examination of McClinton: "Q Do you know what 'take off' means? [¶] A Yes -- he wanted him to fight. [¶] Q [Thomas] wanted to fight Slim? [¶] A Yes."

McClinton put her phone down but later picked it up and heard on the phone an ambulance and someone say, "this man is shot . . . ." She went to 93rd and Avalon where she saw Thomas's dead body on the ground. McClinton had bought Thomas's cellphone for him, and its number was (323) 445-9157. (We refer hereafter to the cellphone with this phone number as Thomas's phone.) McClinton drove to 102nd and saw Spraggins. Spraggins yelled out "Fuck that nigga Hog. He's a snitch."

Nishabia Pettaway lived in an apartment near 93rd and Avalon. About 2:00 a.m. on February 25, 2010, she heard a Black man's voice. The man was arguing. Pettaway heard the man say, " 'You can't see me. You can't see me because, . . . I'll '[fuck]' you up with a slap.' " Pettaway testified, "[a]nd then he was like 'you gonna shoot me.' Then he was like 'Well, [nigga] shoot me then.' " The man was loud as if he were angry. The man also said, " 'I ain't scared' " and "shoot me." The man's voice was the only voice Pettaway

6

heard. Pettaway then heard a gunshot and subsequently heard a big truck that sounded "like a Yukon or something" take off.

About 2:25 a.m. on February 25, 2010, Los Angeles Police Sergeant Jaime Bennett responded to a call pertaining to a man down at 93rd and Avalon. He went there and saw Thomas on the ground. Bennett went to the apartment of LaTonya King. Her apartment was nearby on 93rd. Bennett spoke with King and obtained from her the phone number to appellant's cellphone. The number was (323) 944-4302. (We refer hereafter to the cellphone with this phone number as appellant's phone.) Bennett searched the apartment but appellant was not there.

Thomas's cellphone was next to his body at 93rd and Avalon. McClinton told an officer at the scene that McClinton had heard Thomas mention the moniker Slim during an argument. Los Angeles Police Detective Stacey Szymkowiak testified she scrolled through Thomas's phone and found contact information for "Slim five nine" with the number "(323) 944-*34*02 [*sic*]." Szymkowiak searched King's apartment, which King shared with appellant. Appellant's California identification card and the registration for the Yukon discussed below were found in the apartment. Bennett had information that the registered owner of the Yukon lived in the apartment.

About 2:15 a.m. on February 25, 2010, Los Angeles Police Officer Michael Lanza saw a Black male driving a Yukon SUV and speeding southbound on Avalon near 102nd. The driver slammed on the Yukon's brakes just before 102nd. Lanza attempted to initiate a traffic stop, but the Yukon eventually sped away. Lanza lost sight of the Yukon at 102nd and Broadway. Lanza received a shooting call and responded to 93rd and Avalon. At 2:18 a.m. on February 25, 2010, King called 911 regarding the incident at 93rd and Avalon, and she was one of the first persons to call.

About 2:00 a.m. on February 25, 2010, Leticia Paine was asleep at her home near 102nd and Broadway. She was awakened by the sounds of a vehicle driving fast, and then multiple crashes. She also saw the lights and heard the sirens of police cars. She ran outside and saw that the SUV depicted in People's exhibit No. 9 had crashed. Paine saw a light-skinned Black man exiting the SUV from its driver's side. The man appeared to be

7

injured and was having difficulty walking. The man was wearing a tan shirt and tan pants.[6] Police showed photographs to Paine and she thought photograph Nos. 2 and 6 looked like the person she had seen. She initially denied at trial that she had gotten a good enough look at the man to identify him.

However, after Paine testified, Paine told a detective who was taking Paine home that appellant was the man who had left the SUV. Paine, recalled to the stand, testified as follows. Appellant was the man who left the SUV. At the crash scene, Paine saw appellant's profile from about 23 feet away. Appellant was in an illuminated area when she "really looked at him." At the time, appellant's hair was braided. It was not braided at time of trial. Paine was positive appellant was the man, and she was trying to do the right thing.

Los Angeles Police Sergeant Michael Steward testified as follows. About 2:20 a.m. on February 25, 2010, Steward went to 102nd and Broadway where a Yukon had crashed. The air bag on the driver's side of the Yukon had deployed. A Samsung Metro PCS cellphone was found on the driver's seat of the Yukon. A Black male, apparently a transient, gave Steward reason to look in a particular direction for a person. Steward did not get contact information from the apparent transient.

Szymkowiak examined the cellphone recovered from the Yukon at 102nd and Broadway. Szymkowiak believed the phone number she saw on the cellphone was "(323) 944-*34*02 [*sic*]." The cellphone had a screensaver photograph of appellant and King, several photographs of appellant and King together, and nude photographs of King. Several phone numbers in the cellphone coincided with people involved in the Thomas murder investigation. Those phone numbers included numbers for Thomas, Slim Bad, Frog, and Baby Slim.

---

[6]    Szymkowiak testified at trial that Paine did not describe the shirt as red.

Michael Dikovitsky, a records custodian at Metro PCS, testified based on cellphone records that Bad Slim was the subscriber to phone number (323) 944-4302. (As mentioned, this was the number to appellant's phone.) At 10:41 p.m. on February 24, 2010, Thomas's phone called appellant's phone. Szymkowiak testified, based on phone records, the following. Between 10:30 and 11:30 p.m. on February 24, 2010, appellant and Thomas exchanged three calls. From 12:34 to 12:43 a.m. on February 25, 2010, the two exchanged about 13 calls. Appellant called Thomas at 12:34, 12:35, and 12:43 a.m. Dikovitsky testified that between 12:59 and 1:35 a.m. on February 25, 2010, appellant's phone called Thomas's phone several times.

From 2:00 to 2:20 a.m., all calls to appellant's phone went to voicemail. Szymkowiak testified that from about 2:03 to 2:14 a.m., Thomas called McClinton and his mother. Thomas called McClinton five times. About 2:00 a.m., the last phone call was made to appellant's phone. At that time, appellant's phone was about three miles from 93rd and Avalon.

A detective found a Smith and Wesson revolver in the street at 102nd and Spring. A bullet had been fired from the revolver. Thomas died as a result of a gunshot wound to his head. A coroner removed a bullet fragment from Thomas's head, and the fragment came from a bullet fired from the revolver. DNA from appellant and DNA from Calvin were on a drinking glass in the console of the Yukon. The probability two other persons supplied that DNA was one in 10,000,000. Appellant's thumbprint was found on the inside rearview mirror of the vehicle depicted in People's exhibit No. 9. On April 20, 2010, police arrested appellant and King together. Following appellant's arrest, Szymkowiak noted on a form that appellant had a limp as a preexisting condition.

On April 30, 2010, in a recorded jailhouse conversation, appellant told King to keep a cellphone "[t]hey don't know about" and to have the GPS turned off "so . . . when they [try] to serve you, you won't be there." Appellant said he did not want King to "be in nothing" and appellant said, "they need you." At one point appellant indicated to King that she should not appear in court on a date. He also told her, "Just chill because they're going to be looking for you."

9

On June 16, 2010, Szymkowiak personally subpoenaed King to appear at appellant's June 22, 2010 preliminary hearing. However, on June 21, 2010, during a recorded jailhouse conversation, appellant told King "you . . . just lay low man, starting today." King replied, "I'm out tonight." King did not appear at the preliminary hearing. On November 17, 2010, the trial court ordered King to return to court on November 30, 2010. She did not return and, as of the time of trial, King had not been located.

Los Angeles Police Detective Erik Shear, a gang expert, testified a snitch was the worst thing a gang member could be. A snitch could be beaten or even murdered. If a gang member who was a friend of a snitch was informed by the gang of the snitch's actions and told to bring the snitch to the gang, the friend would be obligated to comply. Failure to comply would lead to consequences as bad as those that would have been imposed on the snitch. Shear opined at trial that the present murder was committed for the benefit of, in association with, and at the direction of, ECC.

2. *Defense Evidence.*

In defense, James Dunn testified he was employed by Chapter 2 Inc., a gang intervention organization. Appellant assisted as a volunteer. Dunn testified at the May 2011 trial that he believed the director of the organization brought appellant in as a volunteer "like last year about summer time [*sic*]."[7] (Dunn never testified as to appellant's whereabouts on February 24 or February 25, 2010.)

During cross-examination, Dunn testified as follows. Dunn did not remember exactly when he met appellant. Appellant's moniker was Slim and appellant was in the "five nine" gang. Dunn's moniker was the Godfather. Dunn suffered a 1981 murder conviction, a 2002 felony conviction for carrying a concealed and loaded firearm, a 2002

---

[7]     The following then occurred during appellant's direct examination of Dunn: "[Appellant's counsel]: Q Now, when you say last year about summer time [*sic*], was it 2010 or was it 2009? Do you remember? [¶] A It was 20 – I think it was last year. 2010, maybe. I think it was '10." Dunn also testified he remembered appellant working with the organization prior to appellant's arrest.

felony conviction for possession of a firearm (as a felon), and a 2004 felony conviction for possession of narcotics for sale.

## ISSUES

Appellant claims (1) the trial court erroneously refused to instruct on voluntary manslaughter based on sudden quarrel or heat of passion, and his trial counsel provided ineffective assistance of counsel by asking the court not to instruct on that issue, (2) appellant's trial counsel provided ineffective assistance of counsel by failing to investigate alibi witnesses and other relevant evidence, (3) the trial court erroneously refused to exclude the identification testimony of Vaughn and Spraggins as products of an impermissibly suggestive single-person photographic showup, (4) there was insufficient evidence appellant committed murder or that the murder was willful, deliberate, and premeditated, and (5) cumulative prejudicial error occurred.

## DISCUSSION

1. *The Trial Court Properly Refused to Instruct on Voluntary Manslaughter.*

    a. *Pertinent Facts.*

During discussions concerning jury instructions, the prosecutor asked the court to instruct on voluntary manslaughter based on sudden quarrel or heat of passion (hereafter, voluntary manslaughter) in light of alleged evidence Thomas and appellant were involved in a heated argument immediately before the killing. The prosecutor indicated he believed appellant was going to request the instruction. Appellant submitted the matter. Later, appellant's counsel indicated he had discussed the matter with appellant, and appellant did not want the court to instruct on voluntary manslaughter. The court ruled it would give the instruction over appellant's objection.

The next day, the court indicated it had reconsidered the matter. The court indicated the only evidence of heat of passion was "the witness that heard the words just before the shot." Appellant's counsel agreed. The court indicated there was insufficient evidence to support a voluntary manslaughter instruction. The prosecutor indicated he had requested the instruction out of an abundance of caution to prevent appellant from appealing on the ground the trial court erroneously failed to give the instruction.

11

Appellant continued to object to the instruction and indicated one reason he was objecting was tactical. Appellant's counsel, reading from CALCRIM No. 570, noted an element of the instruction was "As a result of the provocation the defendant acted rationally [*sic*[8]] and under the influence of intense emotion that obscured his reasoning or judgment." Appellant's counsel denied there was evidence of that element.

The court indicated words alone were insufficient provocation. The court rejected the prosecutor's request that the court instruct on voluntary manslaughter. The court indicated its decision was based in part on the objection of appellant's counsel and the fact he had tactical reasons why he did not want the court to give the instruction.

b. *Analysis.*

Appellant claims the trial court erroneously refused to instruct on voluntary manslaughter. The claim is unavailing. Appellant's counsel, at appellant's personal request, ultimately objected to the trial court giving the instruction. Appellant's counsel indicated he had a tactical reason for objecting to the instruction. Appellant obviously wanted to present the jury with an all-or-nothing decision of convicting appellant of murder or acquitting him on that charge. Appellant waived the issue of whether the trial court erroneously refused to instruct on voluntary manslaughter as a lesser included offense of murder because any such error was invited by appellant. (Cf. *People v. Bunyard* (1988) 45 Cal.3d 1189, 1234-1236.)

Even if the issue was not waived, McClinton's testimony provided evidence that Thomas challenged appellant to fight and used a racial epithet towards appellant. Pettaway testified that Thomas said " '. . . I'll '[fuck]' you up with a slap' " and that, using a racial epithet towards appellant, Thomas invited him to shoot Thomas. In sum, any provocation by Thomas was purely verbal. As to the requisite objective provocation for voluntary manslaughter, "The provocative conduct by the victim *may* be . . . *verbal*, but the conduct must be sufficiently provocative that it would cause an ordinary person of average

---

[8] CALCRIM No. 570 states "rashly," not "rationally."

disposition to act rashly or without due deliberation and reflection. [Citations.]" (*People v. Moye* (2009) 47 Cal.4th 537, 550, italics added.)

However, there is no need to decide whether Thomas's conduct constituted the requisite objective provocation. Even if it did, a defendant's reason must be *actually obscured as the result of a strong passion aroused* by a provocation sufficient to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection, and from this passion rather than judgment. (*People v. Lasko* (2000) 23 Cal.4th 101, 108.) Moreover, the defendant must possess and *act* upon the requisite state of mind. (*People v. Sinclair* (1998) 64 Cal.App.4th 1012, 1016.)

In the present case, the witnesses pertinent to the issue of provocation largely testified only as to what Thomas said. There was no substantial evidence from McClinton, Pettaway, or anyone else that appellant's reason was actually obscured by any provocation, or that appellant acted with the requisite state of mind. For all the record reflects, appellant shot and killed Thomas based on an exercise of judgment, not from passion. A trial court is under no duty to give an instruction unsupported by substantial evidence. (Cf. *People v. Tufunga* (1999) 21 Cal.4th 935, 944.) The trial court did not err or violate appellant's constitutional rights guaranteed by the Fifth, Sixth, and/or Fourteenth Amendments by refusing to instruct on voluntary manslaughter as a lesser included offense of murder.

Moreover, even if the trial court erred as a matter of state law by refusing to instruct on voluntary manslaughter, it does not follow we must reverse the judgment. As later discussed (see, e.g., fn. 9, *post*), there was overwhelming evidence appellant committed not merely murder but willful, deliberate, and premeditated murder. The jury found appellant committed such a murder. It is not reasonably probable a result more favorable to appellant would have occurred absent the alleged error. (Cf. *People v. Box* (2000) 23 Cal.4th 1153, 1171, 1213; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

We similarly reject appellant's claim his trial counsel provided ineffective assistance of counsel by objecting to the court giving a voluntary manslaughter instruction. In light of our previous analysis, appellant's trial counsel properly objected to the instruction because it was unsupported by substantial evidence; therefore, appellant has

13

failed to demonstrate trial counsel's representation of appellant was constitutionally deficient. Even if it was, there was no prejudice for the same reasons any trial court error in failing to give the instruction was not prejudicial. Appellant's ineffective assistance claim fails. (See *People v. Slaughter* (2002) 27 Cal.4th 1187, 1219 (*Slaughter*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*).)

2. *Appellant Was Not Denied Effective Assistance of Trial Counsel by Any Alleged Failure to Investigate Alibi Witnesses or Other Relevant Evidence.*

Appellant makes several claims of ineffective assistance of counsel based on unsworn assertions he made during a *Marsden* hearing concerning his trial counsel's alleged failure to investigate alibi witnesses. (The trial court denied the *Marsden* motion.) We address the claims below.

Appellant claims his trial counsel did not call as a witness his probation officer, "who would have testified that appellant had no injuries two days after the shooting—as [appellant] would have[,] had he been driving the truck that crashed." Appellant cites in support a page of the reporter's transcript that reflects appellant stated during the *Marsden* hearing, "My probation officer wanted to come and testify that two days prior after [*sic*] the incident, I came to her office with no wounds or anything when the investigators went and talked to her."

However, appellant has failed to demonstrate from the record that (1) appellant necessarily would have suffered injury, or observable injury, as a result of having been in the Yukon when it crashed, (2) a probation officer (whom appellant did not name) saw appellant two days after Thomas was killed, (3) any such officer saw all injuries appellant might have received as a result of the crash, (4) any such officer was available to testify at trial, or (5) any such officer would have testified the officer saw no injuries on appellant. Appellant's vague and unsworn self-serving statement during the *Marsden* hearing does not compel a contrary conclusion.

14

Appellant claims his trial counsel did not interview "the person who called and said his uncle did the shooting." Appellant cites in support various pages of the reporter's transcript that indicate that, during the *Marsden* hearing, appellant said there was "an anonymous phone call allegedly that was turned over to us and the victim – I mean, the person on the call said that his uncle was the person that did the crime." Appellant said that, prior to trial, he had given this information to his trial counsel but his trial counsel had failed to investigate it.

However, appellant has failed to demonstrate from the record that (1) such an anonymous phone call was made, (2) how appellant's trial counsel could have investigated the matter if the caller was anonymous, or (3) for that matter, appellant's counsel did not interview the caller. Appellant's statement was unclear as to whether appellant was suggesting the caller's uncle, or Thomas's uncle, committed the crime. Appellant's vague and unsworn self-serving statement relating multiple hearsay does not compel a contrary conclusion.

Appellant claims there was a surveillance tape from a nearby hamburger stand, the tape was provided to appellant's investigator, but it could not be played and the investigator could not review it because it was apparently password-protected and the "prosecutor did not provide access." Appellant cites in support various pages of the reporter's transcript that indicate that, during appellant's *Marsden* hearing, he indicated the hamburger stand was a block from the murder scene and the "D.A. and them" had access to the "code."

However, appellant has failed to demonstrate from the record that (1) such a surveillance tape existed, (2) any camera from which the alleged tape originated had been pointing in the direction of the crime scene or otherwise surveilling that scene, (3) any such camera recorded useful information from a block away, and (4) the prosecutor had access to any password or code needed to access a tape originating from a camera apparently belonging to a private business. Appellant's vague, unsworn statement does not alter that conclusion.

15

Appellant claims "[a] *suspect* was found within the perimeter set up on the night of the shooting to confine the *crime scene*, but his identity was never disclosed. The officers took a statement from a woman who *saw* him, but defense counsel insisted he never received a copy of that statement. [Fn. omitted.]" (Italics added.)

However, the pages of the reporter's transcript cited by appellant demonstrate the prosecutor represented during the *Marsden* hearing that there was mention of "a *witness* at the *scene after the crash* that *may* have some information, including a *homeless* individual *that they could never locate*." (Italics added.) Moreover, the prosecutor represented at the hearing that a detective went to interview Paine's mother "and then they found out it wasn't her that actually supposedly made the observation. It was her daughter [apparently Paine], and they went to talk to the daughter." The prosecutor indicated no notes had been given to him, and the prosecutor was delivering to appellant all discovery the prosecutor possessed. Appellant has failed to demonstrate a woman or Paine's mother saw anyone, or how any of the above facts constituted ineffective assistance of trial counsel.

Appellant claims "The interview with Ms. Wilborne, who was in the car with Thomas before he dropped her off in an area known as the 'jungle' was never provided to the defense, nor were the officer's notes of his interview with her on the night of the shooting. All counsel had was a one-page summary of a statement from Wilborne." (Events involving Wilborne occurred before Thomas went to 102nd and San Pedro.)

However, at the pages of the reporter's transcript cited by appellant, the prosecutor represented during appellant's *Marsden* hearing that Wilborne was interviewed *in the field*, the prosecutor had no "reports [that Wilborne] was interviewed," and Wilborne was not a percipient witness. Appellant's counsel indicated *he did not know* if police interviewed Wilborne and recorded the interview, but *if* police did, appellant did not have "that." Appellant has failed to demonstrate how any of the above constituted ineffective assistance of counsel.

Appellant claims the trial court erroneously denied his presentence motion for the appointment of an investigator to investigate the above matters. In light of the above, the claim is without merit. Appellant claims "Witnesses who would have placed appellant at

16

the gang intervention meeting at the time of the shooting would have provided an absolute defense, or at least cast a reasonable doubt as to appellant's guilt." However, the claim is conclusory, does not identify any such witness, does not explain why appellant would be at a gang intervention meeting about 2:00 a.m. on February 25, 2010, and does not explain how appellant could have been at any such meeting in February 2010 in light of Dunn's testimony at one point to the effect appellant first became a volunteer at Chapter 2 Inc. in the summer of 2010. Appellant has failed to demonstrate trial court error or ineffective assistance of counsel.

Finally, as to all of the above matters relating to appellant's alleged alibi, appellant presented no alibi evidence but instead presented evidence of his participation in a gang intervention organization, apparently as circumstantial evidence that he possessed good character and did not murder Thomas. In any event, there is no real dispute someone murdered Thomas by shooting him in the head. There was overwhelming evidence appellant was the murderer.[9] Accordingly, the alleged instances of constitutionally

---

[9] For example, Vaughn, an ECC member, was a snitch and had a reputation in ECC for being one. Vaughn's close friend Thomas was an ECC member. Appellant was a high-ranking ECC member. The gang could murder a snitch. A snitch's friend advised to bring the snitch to the gang could be murdered by failing to do so. At 116th and Towne, Vaughn personally greeted appellant. Vaughn identified appellant at trial and testified to the effect appellant acted surprised to see Vaughn. Vaughn positively identified appellant as the person driving the SUV depicted in the photograph marked People's exhibit No. 9. Vaughn testified as to his subsequent personal interaction with appellant at 102nd and San Pedro. Police showed Vaughn a DMV photograph and he identified it as depicting appellant. Spraggins, too, identified appellant as driving the SUV depicted in People's exhibit No. 9. Spraggins gave a description of appellant at trial, including the fact his hair was braided. Paine and Calvin testified appellant wore braids. Spraggins testified appellant stuck his head in the window of the Tahoe and greeted Vaughn and Spraggins. She positively identified appellant as the person who looked into the window. They all later went to 102nd. She, too, testified as to her observations of appellant there. Spraggins overheard appellant say to Thomas on the speakerphone that appellant wanted "that nigga" (referring to Vaughn) and that appellant "wanted [Vaughn's] head." Spraggins's testimony, and testimony based on phone records, reflects appellant called Thomas incessantly.

deficient representation concerning appellant's alleged alibi were not prejudicial. Appellant has failed to demonstrate ineffective assistance of his trial counsel, including any ineffective assistance regarding any potential alibi defense. (See *Slaughter, supra,* 27 Cal.4th at p. 1219; *Ledesma, supra,* 43 Cal.3d at pp. 216-217.)

3. *The Identifications of Appellant by Vaughn and Spraggins Were Not Products of Impermissibly Suggestive Identification Procedures.*

　　a. *Pertinent Facts.*

　　Prior to trial, police showed a single photograph of appellant to Vaughn and Spraggins, and each told police the photograph depicted appellant. Prior to the presentation of evidence at trial, appellant moved to exclude those pretrial identifications on the ground the single-person photographic showup was suggestive. Appellant distinguished any in-court identification Vaughn and Spraggins would make from an extrajudicial identification based on a single photograph shown to them. Appellant argued the single photograph was suggestive and the resulting pretrial identification was tainted.

---

McClinton, on the phone, heard Thomas refer to Slim as the person who ultimately would shoot Thomas. After the shooting, Pettaway heard a big truck that "sounded like a Yukon or something" take off. Paine saw that the SUV depicted in People's exhibit No. 9 had crashed near 102nd and Broadway. In an effort to be a good citizen, she told police, and testified at trial, that appellant exited the SUV.

On February 25, 2010, Vaughn saw on television that the SUV (depicted in People's exhibit No. 9) that appellant (Slim) had been driving had been involved in a crash. Spraggins saw on television the same crashed SUV, i.e., the one appellant had been driving. Steward and Szymkowiak identified the crashed SUV at 102nd and Broadway as a Yukon. Szymkowiak testified the registration for the Yukon, and appellant's California identification card, were found in King's apartment, which she shared with appellant. Appellant's cellphone was found in the Yukon, his thumbprint was found on the inside mirror of the SUV, and his DNA was found on a drinking glass in the SUV. The gun used to kill Thomas was found at 102nd and Spring. There is no dispute as to the sufficiency of the evidence supporting appellant's conviction on count 2; appellant's actions in dissuading King from testifying were evidence of his consciousness of guilt. Shear opined the murder of Thomas was gang-related; this provided a motive for appellant to kill Thomas.

The prosecutor represented that police interviewed Vaughn and Spraggins on the night of the murder. Several photographs were then shown to them, a single DMV photograph was shown to each, but a six-pack folder was not shown to them. The prosecutor believed appellant was not arrested until a month and a half later. The court, noting Vaughn and Spraggins each had seen appellant prior to the single-person photographic showup, ultimately denied appellant's motion.

b. *Analysis.*

Appellant claims the trial court erroneously refused to exclude the identification testimony of Vaughn and Spraggins as the products of an impermissibly suggestive single-person photographic showup. We disagree. At the outset, we note appellant asked the trial court to exclude the pretrial identifications of Vaughn and Spraggins, not their in-court testimony. We assume without deciding the issue of the admissibility of their in-court testimony is preserved for appellate review.

A defendant has the burden of showing that an identification procedure was so unfair it violated the defendant's due process rights. (*People v. Sanders* (1990) 51 Cal.3d 471, 508.) We review independently any trial court ruling that a pretrial identification procedure was not unduly suggestive. (*People v. Avila* (2009) 46 Cal.4th 680, 698.)

First, a single-person photographic showup is not inherently unfair or impermissibly suggestive. (Cf. *People v. Ochoa* (1998) 19 Cal.4th 353, 413, 425-426.) Appellant's claim fails for this reason alone. (*Id.* at p. 412.) Second, we have set forth here and in our Factual Summary pertinent facts concerning such factors as the opportunity of Vaughn and Spraggins to have viewed appellant, their prior familiarity, if any, with appellant, the degree of their attention during the events of February 24 and/or February 25, 2010, the accuracy of any prior descriptions by them of appellant, the level of any certainty demonstrated at the time of the showup, and the time between the crime and the showup. Considering these factors, we conclude that even if the single-person photographic showup was unduly suggestive, the pretrial identifications by Vaughn and Spraggins following that showup, and their in-court identification testimony, were reliable under the totality of the

circumstances. (Cf. *People v. Nguyen* (1994) 23 Cal.App.4th 32, 39; see *People v. Gordon* (1990) 50 Cal.3d 1223, 1242.)

Finally, we have concluded in part 2, *ante* (see, e.g., fn. 9, *ante*), that there was overwhelming evidence appellant was the person who murdered Thomas. That evidence was overwhelming even absent the testimony of Vaughn and Spraggins identifying appellant. Any erroneous admission of their identifications or the DMV photograph was harmless beyond a reasonable doubt. (Cf. *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1119, fn. 22; *People v. St. Germain* (1982) 138 Cal.App.3d 507, 518-519, *People v. Sandoval* (1977) 70 Cal.App.3d 73, 85-86.)

4. *There Was Sufficient Evidence Appellant Committed First Degree Murder.*

Appellant claims there is insufficient evidence he committed first degree murder. He argues there was insufficient evidence he was the person who shot Thomas, and insufficient evidence any murder was willful, deliberate, and premeditated. We disagree.

As for appellant's identification argument, we have concluded in part 2, *ante* (see, e.g., fn. 9, *ante*), that there was overwhelming evidence appellant was the shooter. Appellant's identification argument fails. As for appellant's premeditation argument, the overwhelming evidence appellant murdered Thomas was also overwhelming evidence appellant committed a willful, deliberate, and premeditated gang-related shooting and murder of Thomas because appellant had "wanted [Vaughn's] head" for being a snitch, and Thomas had let Vaughn get away from appellant and ECC. There was sufficient evidence appellant committed the first degree willful, deliberate, and premeditated murder of Thomas. (*People v. Ochoa, supra,* 6 Cal.4th at p. 1206.)[10]

---

[10] In light of our above analysis, we reject appellant's claim cumulative prejudicial error occurred.

20

## *DISPOSITION*

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

KLEIN, P. J.

ALDRICH, J.