Filed 3/5/14  P. v. Jacobs CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KYLE CHRISTOPHER JACOBS,<br><br>    Defendant and Appellant. | B244421<br><br>(Los Angeles County<br>Super. Ct. No. KA095828) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Toni R. Johns Estaville, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Kyle Christopher Jacobs appeals from the judgment entered following his conviction for voluntary manslaughter (Pen. Code, 192, subd. (a)) with firearm use (Pen. Code, § 12022.5, subd. (a)). The court sentenced appellant to prison for six years. We affirm the judgment.

## FACTUAL SUMMARY

1. *People's Evidence.*

Viewed in accordance with the usual rules on appeal (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 (*Ochoa*)), the evidence, the sufficiency of which is undisputed, established that prior to March 2011, appellant lived in the Diamond Bar home of Christine Jacobs (Christine), appellant's mother. Ryan Modica (the decedent) rented a room there. In March 2011, Christine evicted Modica.[1]

a. *The Testimony of Joshua Moloney.*

Joshua Moloney testified that on April 7, 2011, he was across the street from appellant's house. Moloney saw Modica's car arrive, and Modica and appellant argued. Modica yelled from inside the car and appellant was near his garage. Modica was arguing about his property.

Modica exited the car and walked towards the driveway and appellant. At some point appellant armed himself with a shotgun. Modica walked towards the driveway with his hands in the air. When Moloney demonstrated at trial how Modica's hands were, the prosecutor commented Moloney's hands were palms up and above his head, forming a Y. The court stated "Much like the symbol for a touchdown from a referee in a football game, exactly that."

---

[1] On April 1, 2011, a sheriff's deputy went to the above residence. Appellant explained he had been arguing with Modica and was afraid Modica would return. Appellant told a deputy that appellant had a gun and wanted to know if appellant needed to defend himself with it. Appellant asked, "Do I need to cherry pie his ass?" Appellant was angry and said, "I had the gun to his head. I should have shot him when I had the chance and said it was self-defense."

2

Moloney testified that, a few times, Modica's hands were up in a taunting manner. Moloney saw something in Modica's hand. Appellant held the shotgun with his arm fully extended, and Modica was less than eight feet from appellant. Modica said, "I'm not scared of you." Modica was walking towards appellant but Modica stopped.[2] Appellant shot Modica in the right eye, Modica's body flew back six to eight feet, and Modica lay mortally wounded.

Moloney ran to the middle of the street near Modica's car and saw Modica on the ground. Moloney saw a hammer by Modica's hand. Moloney guessed it was Modica's right hand. Appellant later walked to Modica's body and looked at it, but did not approach closer than one or two feet from Modica's feet.[3]

b. *The Testimony of Sheriff's Deputies.*

Los Angeles County Sheriff's Deputies Perry Vellanoweth and Mark St. Amant were two of the first deputies at the scene. Appellant told them that he had just shot his former roommate (i.e., Modica) because Modica had attacked appellant with a hammer. St. Amant took appellant into custody.

After St. Amant placed appellant in the patrol car and before Vellanoweth entered the garage, Vellanoweth saw Modica's body. Vellanoweth testified a hammer, glasses, and shotgun casings were next to the body, and the handle of the hammer was across Modica's right forearm, closer to the wrist.

People's exhibit Nos. 14 and 19, admitted into evidence, are photographs of Modica's body lying on the driveway on his back with his head next to the street and his

---

[2] Moloney testified at the preliminary hearing he could not say whether Modica was standing or walking up the driveway when appellant fired.

[3] Marie Aguinaga, a neighbor, testified she saw Modica walking up the driveway toward appellant's home. Modica was gesturing and appeared to be angry. Aguinaga testified she could not say whether Modica had anything in his hands. Los Angeles County Sheriff's Detective Rhonda Toy spoke with Aguinaga at the scene that day. Toy testified Aguinaga told Toy without hesitation Aguinaga had not seen anything in Modica's hands.

3

feet towards the house.  The exhibits also depict the following.  Modica's right arm is extended from his body about 90 degrees, and the hammer is between his right arm and his torso.  The hammer's head is about an inch or two from the center portion of Modica's right forearm, and the end of the hammer's handle is about a foot from Modica's right hand.  No part of the hammer is touching any part of Modica's body.  Modica's right hand is open.  Sunglasses are between Modica's right hand and the hammer's handle.

At trial, the prosecutor showed People's exhibit No. 19 to Vellanoweth.  The following occurred: "[The Prosecutor]:  I'm going to ask you is that how you saw these two items [the hammer and sunglasses] in relation to the right hand?  [¶]  [By Vellanoweth]  A.  The hammer, no.  The hammer was across his wrist."  Vellanoweth testified People's exhibit No. 19 did not depict how the hammer was placed when Vellanoweth entered and later exited the house.  Appellant told Vellanoweth that Modica had charged at appellant with a hammer, and Vellanoweth testified "it seemed out of place to see it across the wrist like that."

During cross-examination, Vellanoweth testified he entered the house, was inside about a minute, exited, and the hammer was "across [Modica's] forearm and wrist area."  Vellanoweth also testified when he exited the house, he saw Modica and "it occurred to me that the hammer is across the wrist."  Vellanoweth escorted a paramedic to Modica.  Vellanoweth did not know what the paramedic did or whether the paramedic touched Modica or moved the hammer.

St. Amant testified that while entering the garage, he saw Modica's body lying on the driveway.  The handle of the hammer was lying across Modica's right wrist and his palm was up.  The head of the hammer was right around Modica's elbow.  St. Amant testified People's exhibit No. 14 did not depict the hammer's location when St. Amant first saw it.  St. Amant testified "it seemed like it was on his wrist, so it doesn't look like that."  St. Amant wrote a supplemental report indicating the hammer was near Modica's

4

hand. St. Amant testified People's exhibit No. 14 depicted the location of the hammer after St. Amant first saw it.

Los Angeles County Sheriff's Detective Mark Lillienfeld went to the crime scene. He saw Modica's body on or near the driveway apron and 10 feet from Modica's car door. Lillienfeld testified crime scene photos depicted the hammer next to Modica's right arm and blood on parts of his right hand.

c. *Appellant's Statement to Lillienfeld.*

Appellant told Lillienfeld the following. On April 1, 2011, appellant told a deputy, "Fucking dude, I coulda just splatted a cherry pie on that fucking wall so quick by . . . the time you idiots get here." Appellant explained to Lillienfeld that appellant meant he could have shot Modica and splattered his brain like a cherry pie on the wall.

On April 7, 2011, the day of the shooting, appellant was in his garage. Appellant heard Modica's car approaching and appellant opened the garage door. Modica asked appellant where a tool belonging to Modica was. Appellant denied knowing where it was and Modica indicated it was on Modica's desk. Appellant told Modica to stay in the car and appellant would look for the tool.

Appellant and Modica argued and Modica gestured. Appellant and Modica argued probably about 30 or 45 seconds while Modica was in the car. Modica exited the car with a hammer in his right hand. Appellant was armed with his shotgun. The two continued arguing. Appellant and Modica argued probably 45 seconds to a minute when Modica was outside the car. Modica said, " 'there's gonna be a day when you're out there and you don't have that gun and . . . [¶] . . . [¶] you're gonna be out and about, man, and I'm going to get your ass.' " Appellant replied, " 'Like fucking hell you are.' "

Modica said, " 'Well, I'm standing right here. Like, if you shoot me, you're gonna go to prison . . . ." Appellant replied, " 'If you cross that line, you piece of shit, I ain't.' " Appellant was referring to the line separating the sidewalk from his driveway. Modica answered, " 'What? That line?' "

Modica began crossing the line. Appellant shot him. Appellant indicated to Lillienfeld the matter was reminiscent of childhood years when a child would say, " 'This the line. You cross, you're breathing my air.' " Appellant told Lillienfeld, "I [expletive] put the ultimatum out."

Appellant also told Lillienfeld the following. Appellant and Modica were on the driveway with the shotgun and hammer, respectively. Modica said, " 'I'm gonna catch you out there in the street.' " Appellant told Lillienfeld, " '[Modica said] I'm gonna catch you in the streets, and you ain't gonna have that fucking gun.' " Appellant also told Lillienfeld, "And, at that point, that's probably when my brain clicked" and appellant became serious about shooting "because I'm not gonna live in fear the rest of my life.' " Appellant told Modica, " 'Fucking cross that fucking line, end this shit.' " When appellant shot Modica, the two were about seven or eight feet apart. Appellant told Lillienfeld that after appellant fired the shot, appellant "kept that thing fucking just on that motherfucker, like, 'Oh, you just twitch, and you're getting another one.' "

Lillienfeld asked appellant what would have happened if appellant had not shot Modica "when he walked over that line." Appellant replied appellant "would've been at home, right now, checking over my shoulder every [expletive] two seconds." One reason appellant shot Modica was "just peace of mind" so appellant would not be looking over his shoulder.

Lillienfeld asked what appellant thought Modica would have done if appellant had not shot him. Appellant replied, "Whupped my ass. I have no idea." Appellant felt Modica was very moral sometimes, but completely inhuman other times. Appellant did not know if appellant and Modica would have fought and then stopped fighting, or whether Modica would have "kept pounding." Appellant was not going to take a chance.

d. *Additional Evidence.*

A deputy medical examiner testified Modica died of a shotgun wound to the right eye. The wound contained birdshot pellets, wading, and pieces of glass. A criminalist testified DNA on the handle of the hammer matched Modica's DNA profile, and

appellant was excluded as a contributor. A firearms examiner testified the shotgun muzzle was about five feet from Modica's face when the shotgun was fired. The People introduced evidence appellant was a violent person.

2. *Defense Evidence.*

In defense, appellant presented evidence Modica had been evicted from appellant's house, Modica was a violent person, and Modica said he would get revenge against appellant. A doctor testified based on toxicology results Modica was under the influence of methamphetamine at the time of his death. Methamphetamine was a stimulant and a person under the influence of methamphetamine would be hyperalert, agitated, and readily violent.

## ISSUES

Appellant claims (1) *Brady* error occurred, (2) the trial court erroneously denied his motion for a new trial, (3) he was denied effective assistance of counsel, and (4) the failure of the prosecutor to produce a report, and the trial court's denial of the motion for a new trial, violated appellant's constitutional rights.

## DISCUSSION

1. *No Brady Error Occurred.*

　　a. *Pertinent Facts.*

　　　　(1) *Trial Proceedings.*

The information charged appellant with the murder of Modica. During jury trial, the court instructed the jury on voluntary manslaughter, based only on a theory of imperfect self-defense, as a lesser included offense of murder. The court also instructed on perfect self-defense. Appellant thoroughly argued to the jury that he shot Modica in perfect self-defense, and argued there was no evidence of imperfect self-defense.

　　　　(2) *July 20, 2012 Sentencing Hearing.*

During the July 20, 2012 sentencing hearing, appellant moved for a continuance. The trial prosecutor, Los Angeles Deputy District Attorney T. D. Pham, represented as follows. Prior to or during trial, Pham was informed Dr. Lynne D. Herold (later

7

identified as a senior criminalist of the Los Angeles County Sheriff's Department) had performed a blood splatter analysis of the crime scene and had orally informed the People that her opinions were inconclusive as to the nature of the splatter evidence. Herold could not say dispositively whether the "mallet" was in Modica's hand at the time of the shooting. Pham "made that known."

Pham also represented as follows. Due to Herold's inability to form any conclusion, Herold did not produce a report. Pham informed the defense that that was the status of that part of the investigation. Appellant's counsel wanted a copy of the report but none existed. After trial, Herold told Pham a report had been produced but was unavailable because Herold's supervisor had not reviewed it. Herold expected the review to occur the following week. The report's results did not differ from the verbal opinions Herold previously had told Pham. After Pham's representations, the court continued the case so appellant could obtain the report.

(3) *Appellant's Motion for a New Trial.*

On September 26, 2012, appellant lodged with the trial court a motion for a new trial. The motion was based on *Brady*[4] and on the ground "the verdict is contrary to the evidence under Penal Code section 1181(6)."[5] The motion was not expressly based on newly-discovered evidence, i.e., the ground set forth in Penal Code section 1181, paragraph 8.

A copy of Herold's report (report) was attached to the motion. The report, a laboratory examination report dated August 28, 2012, reflects as follows: "On June 21,

---

[4]     *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215] (*Brady*).

[5]     Penal Code section 1181, paragraph 6 provides that upon application of the defendant, the trial court may grant a new trial "[w]hen the verdict . . . is contrary to law or evidence." When considering a motion for a new trial based on this ground, the trial court independently weighs the evidence and effectively acts as a 13th juror. (*People v. Lagunas* (1994) 8 Cal.4th 1030, 1038, fn. 6; *People v. Veitch* (1982) 128 Cal.App.3d 460, 467.

2012,[6] Deputy District Attorney Pham requested a second review of the case with respect to the possible hammer location and position at the time of the shotgun discharge." Pham wanted Herold to assume hypothetically the hammer was first observed at the crime scene with the handle resting on the right arm of the victim instead of on the broken eyeglasses as depicted in the first crime scene photographs.

Herold forensically examined the metal hammer. In the portion of the report entitled "Foundational Observations and Foundational Conclusions" (some capitalization omitted), Herold stated, inter alia, "4. The victim was observed and first photographed at the scene lying supine on the apron of a driveway, blood spattered arms extended out from his sides with his hands palm up, . . ." Herold's report later stated, "6. No blood was observed on the victim's right or left palms in the areas that would be in contact with the hammer handle if the hammer were being held in the conventional manner. [¶] . . . [¶] 8. Both of the victim's right and left ventral arm surfaces were observed to be spattered with blood but are not saturated with blood . . . . No blood transfer patterns were observed on the ventral surfaces of the victim's arms or clothing."

The report then stated, "9. Fewer spattered bloodstains were observed on the ventral surface of the right arm and right T-shirt sleeve than on the ventral surface of the left arm and left T-shirt sleeve. The position and direction of the bloodstain spatters indicate the arms were at least partially raised, and the ventral surfaces rotated forward (as opposed to slack and resting in a natural stance at the sides) at the time of the shotgun wounding."

Herold's report continued, "10. The hammer was observed and first photographed at the scene lying in position adjacent to the victim with the handle resting on top of what were, reportedly, the victim's broken eyeglasses. This is consistent with the finding of glass in the wound track during the autopsy and the victim wearing the glasses at the time of shotgun discharge. . . . No blood transfer patterns (e.g. bloody shoeprints or other

---

**6**     On June 21, 2012, the jury reached its verdict in this case.

objects) were observed indicating movements within the incident location or near the victim. [¶] 11. None of the above stated foundational observations and/or conclusions #1 through #10 were different or modified based on consideration of the hypothetical resting position of the hammer handle being on the victim's right arm instead of the first photographed position of the handle on the broken glasses adjacent to the right arm."

In the portion of the report entitled "Interpretive Conclusion" (some capitalization omitted), Herold stated: "The interpretive conclusion of this case review is considered inconclusive. It is not possible to determine whether the hammer necessarily was or was not in the hand of the victim when he sustained the shotgun wound to the face. [¶] The inability to unequivocally locate and/or position the hammer at the time of shotgun discharge is primarily due to two factors: [¶] 1. the absence of blood on the hammer, and [¶] 2. the particular bloodstain patterns of the crime scene which do not mandate that the hammer must have been bloodstained if it was present in the area or held by the victim at the time of the shotgun discharge and the victim's subsequent bleeding."

The report then states, "The hammer could have been absent from the area at the time of the shotgun discharge and subsequently placed near the victim, or the hammer could have been held by the victim at the time of shotgun discharge and not been a target surface of the spattered blood. In either scenario the appearance of the hammer and scene bloodstain patterns could be the same and indistinguishable. Additionally, this would be true regardless of the resting place of the hammer being near the victim on his broken glasses as observed in the photographic documentation of the scene, or being on the victim's right arm as the hypothetical query from Deputy District Attorney Pham."[7]

---

[7] Attached to the motion was a declaration from Nancy Sperber, an attorney and bloodstain pattern analysis expert. In the declaration, Sperber stated, "As to the opinion offered by Ms. Herold that it is not possible to determine whether the hammer necessarily was or was not in the hand of the decedent when he sustained the gunshot, I agree to some extent but disagree with her final conclusions. The fact that there was no blood spatter anywhere in the palm area of the right hand would tend to support a finding that the decedent was holding something in his hand, in a clasped manner, as indicated by the blood on his right thumb and finger. The location of the hammer is also consistent with

At the October 1, 2012 hearing on appellant's motion, appellant argued the People's failure to produce Herold's report earlier was a *Brady* violation and there was insufficient evidence supporting the verdict. Appellant never expressly argued evidence was newly-discovered under Penal Code section 1181, paragraph 8.

The court, discussing the motion for a new trial, concluded there was substantial evidence supporting the verdict appellant shot Modica and acted in imperfect self-defense. The court indicated the colloquy during which appellant challenged Modica to cross over the line was inconsistent with perfect self-defense. The court denied the motion. The court did not expressly rule on the *Brady* issue or a motion for a new trial based on newly-discovered evidence under Penal Code section 1181, paragraph 8.

b. *Analysis.*

Appellant claims Pham committed *Brady* error by failing during trial to provide Herold's report. Appellant argues the report contained evidence favorable and material to appellant's defense of perfect self-defense, namely, when appellant shot Modica, Modica's arms were at least partially raised and Modica "could" have been holding the hammer in his hand. We reject appellant's claim.

" . . . 'There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282 [144 L.Ed.2d 286, 119 S.Ct. 1936] (*Strickler*), fn. omitted.) Prejudice, in this context, focuses on 'the materiality of the evidence to the issue of guilt or innocence.' [Citations.]" (*People v. Salazar* (2005) 35 Cal.4th 1031,1043 (*Salazar*).)

the decedent falling on his left side and then rolling onto his back and releasing the hammer as his right arm fell to the ground." We note (1) Sperber's declaration did not explain why the fact there was no blood spatter anywhere in the palm area of Modica's right hand did not simply tend to support a finding Modica's right hand was closed, whether or not it was holding something and (2) Sperber's declaration about the "location of the hammer" did not purport to be based on blood splatter evidence.

There is no *Brady* claim of prosecutorial suppression of evidence when information is fully available to a defendant at the time of trial and the defendant's only reason for not obtaining and presenting the evidence to the court is the defendant's lack of reasonable diligence. (*People v. Morrison* (2004) 34 Cal.4th 698, 715.) Materiality requires a defendant to show a reasonable probability of a different result (*Salazar, supra,* 35 Cal.4th at p. 1043), i.e., the evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (*Kyles v. Whitley* (1995) 514 U.S. 419, 435 [131 L.Ed.2d 490, 506].)

In the present case, at the July 20, 2012 sentencing hearing, Pham represented to the effect that during trial no written report by Herold existed because Herold had been unable to form any conclusion. No suppression or nondisclosure (suppression) of the written report occurred for purposes of *Brady* because there was no written report to suppress.

Moreover, Pham's representations to the court, fairly understood, were that before or during trial Pham learned (1) Herold had performed a blood splatter analysis, (2) her opinions were inconclusive as to the nature of the blood splatter evidence, (3) she could not dispositively say whether the hammer was in Modica's hand at the time of the shooting and, (4) no report had been generated. Pham also effectively represented that, during trial, he informed appellant's trial counsel of these facts. Pham indicated Herold's verbal opinions did not differ from the results in her later report.

Appellant's trial counsel, with reasonable diligence, could have followed up on Pham's representations and learned the information later memorialized in the report, i.e., when appellant shot Modica, Modica's arms were at least partially raised and Modica "could" have been holding the hammer in his hand. For this reason as well, no suppression of any evidence for purposes of *Brady* occurred.

Moreover, Herold's report stated, "The interpretive conclusion of this case review is considered *inconclusive*." "Inconclusive" means "leading to no conclusion or definite

12

result."[8]  The report stated, "It is *not possible* to determine whether the hammer *necessarily was or was not* in the hand of the victim when he sustained the shotgun wound to the face."  (Italics added.)  The report also stated, "The hammer *could have been absent from the area* at the time of shotgun discharge and subsequently placed near the victim, or the hammer *could have been held by the victim* at the time of shotgun discharge and not been a target surface of the spattered blood."  (Italics added.)

In sum, the report presented alternative *theoretical* possibilities without evidence as to which one was, or was even more likely to be, true, i.e., (1) Modica's arms were at least partially raised and it was possible Modica held the hammer, and (2) Modica's arms were at least partially raised and it was possible Modica did not hold the hammer.

A defendant is required to raise a *reasonable* doubt the defendant acted in perfect self-defense.  The People then have the burden to prove the defendant guilty beyond a reasonable doubt, including proof beyond a reasonable doubt the defendant did not act in self-defense.  (*People v. Saavedra* (2007) 156 Cal.App.4th 561, 570-571.)  Moreover, as CALCRIM No. 220, the reasonable doubt instruction given in this case, explained, *reasonable* doubt is not the same as *possible* doubt.

The alternative *theoretical possibilities* presented by the report raised only *possible* doubt, not reasonable doubt, that appellant acted in perfect self-defense.  Evidence of these mere alternative theoretical possibilities was therefore neither favorable nor material to appellant's perfect self-defense theory.

Even if evidence from the report that Modica's arms were at least partially raised and Modica "could" have been holding the hammer in his hand was favorable, it does not follow *Brady* error occurred.  Moloney saw Modica walk towards the driveway with Modica's hands in the air.  Moloney thought Modica had his hands up in a taunting manner, and Moloney saw something in Modica's hand.

---

[8]  Merriam-Webster's Collegiate Dictionary (10th ed. 1995) page 589.

13

After appellant shot Modica, Moloney ran near Modica's car and saw Modica lying on the ground with a hammer near Modica's right hand. Appellant told Vellanoweth and St. Amant that appellant shot Modica because Modica attacked him with a hammer. Both deputies saw Modica's body and a hammer. Vellanoweth saw the hammer lying across Modica's forearm. People's exhibit Nos. 14 and 19 depict the hammer lying near Modica's right arm and right wrist. St. Amant testified he saw the handle of the hammer lying across Modica's right wrist, and St. Amant's report indicated the hammer was near Modica's hand. Lillienfeld saw a hammer next to Modica's right arm. Appellant later told Lillienfeld that Modica exited Modica's car with a hammer in his hand. Modica's DNA profile was found on the hammer's handle.

In sum, ample evidence was presented at trial Modica had his hands up and was holding the hammer. Any evidence from Herold's report that Modica's arms were at least partially raised and Modica "could" have been holding the hammer in his hand would have been cumulative. Any evidence from Herold's report would not have presented a reasonable probability of a different result in this case.

Finally, we have set forth in detail appellant's statement to Lillienfeld. In it, appellant indicated Modica, during a verbal argument lasting probably 45 seconds to a minute, threatened appellant with *future* harm when Modica caught him in the streets without the shotgun. Appellant told Lillienfeld that Modica told appellant that Modica was "*standing* right here," (italics added) just before appellant indicated to Modica that appellant would shoot him and not go to prison if Modica crossed the line. The event reminded appellant of a juvenile challenge. Lillienfeld asked appellant what happened when Modica "walked" over the line. Appellant did not then reply Modica ran over the line. Modica began crossing the line and appellant shot him. Appellant indicated one reason he shot Modica was for peace of mind. Appellant also indicated he had no idea what Modica would have done if appellant had not shot him, and appellant would have shot him again if he had even twitched.

14

The court instructed the jury on perfect self-defense and appellant thoroughly argued to the jury that he shot Modica in perfect self-defense. The jury, which heard all the evidence, necessarily rejected that argument when the jury convicted him of voluntary manslaughter.

The court, using CALCRIM No. 505, instructed the jury on perfect self-defense and there is no dispute that instruction correctly states the law. According to that instruction, perfect self-defense requires that a defendant (1) *reasonably* believe the defendant is in imminent danger of being killed or suffering great bodily injury, (2) *reasonably* believe the immediate use of deadly force is necessary to defend against that danger, and (3) use no more force than is *reasonably* necessary to defendant against that danger.

Even if Modica's arms were partially raised and he "could" have been holding the hammer in his hand, appellant's above discussed statement to Lillienfeld so militated against the conclusion that appellant satisfied the above three enumerated reasonableness requirements for perfect self-defense that there was no reasonable probability of a different result. Indeed, it is difficult to explain the jury's verdict convicting appellant of voluntary manslaughter (based on imperfect self-defense) and rejecting perfect self-defense unless the jury, based on appellant's statement to Lillienfeld, concluded beyond a reasonable doubt the reasonable requirements of perfect self-defense had not been met. Appellant has failed to demonstrate any suppressed evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

2. *The Trial Court Did Not Erroneously Deny Appellant's Motion for a New Trial.*

Appellant claims the trial court abused its discretion by denying appellant's motion for a new trial based on newly discovered evidence pursuant to Penal Code section 1181, paragraph 8. We disagree.

First, appellant never made a motion for a new trial based on newly-discovered evidence under Penal Code section 1181, paragraph 8. Appellant's motion for a new trial

15

was based on the ground the verdict was "contrary to law or evidence" within the meaning of section 1181, paragraph 6.

Second, even if appellant made a motion for a new trial based on newly-discovered evidence, it does not follow the judgment must be reversed. In ruling on a motion for a new trial based on newly-discovered evidence, the trial court considers, inter alia, whether (1) the evidence is not merely cumulative, (2) the evidence is such as to render a different result probable on a retrial, and (3) the party could not with reasonable diligence have discovered and produced the evidence at the trial. (*People v. Delgado* (1993) 5 Cal.4th 312, 328.) A motion for a new trial based on newly-discovered evidence is looked upon with disfavor. (*People v. Shoals* (1992) 8 Cal.App.4th 475, 485-486.) We assume we review de novo a trial court's denial of a motion for a new trial. (Cf. *People v. Ault* (2004) 33 Cal.4th 1250, 1262, fn. 7; *People v. Albarran* (2007) 149 Cal.App.4th 214, 224, fn. 7.)

For the reasons previously discussed in our analysis in part 1 of our Discussion, we conclude appellant did not satisfy the above three enumerated requirements for a motion for a new trial based on the alleged newly-discovered evidence of Herold's written report. Even if appellant had made such a motion, denial of the motion would have been proper.

3. *Appellant Was Not Denied Effective Assistance of Counsel and No Violation of His Constitutional Rights Occurred.*

Appellant claims he was denied effective assistance of counsel to the extent his trial counsel failed to exercise appropriate diligence to obtain Herold's written report. We disagree. The record sheds no light on why appellant's trial counsel failed to act in the manner challenged, the record does not reflect said counsel was asked for an explanation and failed to provide one, and we cannot say there simply could have been no satisfactory explanation. We reject appellant's ineffective assistance claim. (See *People v. Slaughter* (2002) 27 Cal.4th 1187, 1219; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.)

Moreover, our analysis in part 1 of the Discussion provides a satisfactory explanation why appellant's trial counsel did not seek to obtain the written report during trial. Based on the totality of the circumstances, appellant's trial counsel reasonably could have concluded evidence in the report Modica's arms were at least partially raised and Modica "could" have been holding the hammer in his hand was irrelevant and/or excludable under Evidence Code section 352 as cumulative.

Finally, in light of our analysis of appellant's claims regarding *Brady* error and his motion for a new trial, we reject appellant's claim the prosecutor's failure to produce Herold's report and the trial court's denial of appellant's motion for a new trial violated his rights to due process, a fair trial, to be heard, to present a defense, to confrontation, to cross-examination, or to compulsory process under the federal Constitution. To the extent any such errors may be reviewed for prejudice, we conclude they were harmless beyond a reasonable doubt. (Cf. *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705].)

## *DISPOSITION*

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

KLEIN, P. J.

ALDRICH, J.